IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TREMONT REALTY CAPITAL, INC.,

   Plaintiff,

v.

PINNACLE GROUP, LLC, ADAMS
CANYON RANCH, LLC, JOHN LANG,
and MICHAEL GRADY,

   Defendants.

Civil Action No. 04-11853-RGS

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS PURSUANT TO FED R. CIV. P. 12(B)(2),
OR IN THE ALTERNATIVE, MOTION FOR TRANSFER
OF VENUE PURSUANT TO 28 U.S.C. §1404(A)**

Plaintiff Tremont Realty Capital, Inc. ("Tremont") submits this memorandum in opposition to defendants', Pinnacle Group, LLC, Adams Canyon Ranch, LLC ("ACR"), John Lang ("Lang") and Michael Grady ("Grady") [*collectively*, "Defendants"], motion to dismiss, or alternatively, transfer venue, dated October 15, 2004 ("Motion").

**Introduction**

Two central facts, standing alone, demonstrate that the requisite minimum contacts exist for the Court to exercise specific personal jurisdiction over the defendants in this dispute. First, the contract contemplated and necessarily required that the parties interact and communicate regularly between defendant's Arizona office and plaintiff's Boston office, including a consistent exchange and transmission of information and documents between those offices, via telephone, facsimile and e-mail. Second, defendant knew at all times, including prior to the written

contract's execution, that all of the services Tremont was agreeing to provide would be performed in Massachusetts, which is in fact what occurred.

Apart from those central and dispositive facts, however, the defendants' assertion that they never spoke with any of Tremont's Boston-based personnel prior to the execution of the written agreement is simply untrue. Dan Mee, one of Tremont's Executive Directors, participated, via phone, from his Boston office, in the negotiation of the contract's key terms, including exclusivity, fee structure, carve-outs, break-up fees, and retainers. As defendants well know, Tremont's one Arizona-based representative lacked the expertise, background, and authority to negotiate these points.

In any event, defendants' argument for dismissal is flawed because it simply ignores the impact of the parties' course of dealings under their agreement. The constitutional analysis does not stop at the time of formation and execution. Rather, it considers the parties' expectations and interactions over the course of their relationship. Defendants acknowledge that communications with Tremont's Boston office occurred after execution. It is of no moment that this may be defendants' only business relationship in Massachusetts, or that they have never physically appeared in the Commonwealth. It is the quality of the interactions between the parties which controls.

Thus, while plaintiff has demonstrated that its Boston office was necessary and instrumental in the formation of the contract, the undisputed activity that occurred after execution is otherwise sufficient to bring the defendants within the Court's jurisdiction. Defendants' motion to dismiss should be denied. Similarly, because the defendants have not and cannot demonstrate any impossible or unduly onerous burden in defending against plaintiff's claims in this district, their request to transfer venue should also be denied.

**Background**

Plaintiff's opposition to the Motion is supported by the affidavits of Daniel O.Mee ("Mee Aff."), Russell L. Posorske ("Posorske Aff."), Richard C. Gallitto ("Gallitto" Aff."), and Jared R. Lewis ("Lewis Aff."). From those affidavits and defendants' submissions, plaintiff is able to make the following *prima facie* factual showing, which amply supports the Court's exercise of jurisdiction.

I.   Tremont's Business and Relationship to Russell Posorske

Tremont is a Massachusetts-based real estate advisory firm, which raises debt and equity financing for real estate owners and developers across the United States. Mee Aff., at ¶2. Tremont's principal place of business and headquarters is located in Boston, Massachusetts. *Id*. In addition to the Boston headquarters, Tremont employs six marketing representatives in regional offices throughout the country, and maintains one analyst in its Chicago office. *Id.* In May of 2003, Tremont entered a joint venture with an entity located in Scottsdale, Arizona, which was known as Fortis Development ("Fortis"). *Id*. at ¶3. The joint venture was named Tremont-Fortis LLC. *Id*. Under that joint venture, Mr. Posorske became a Senior Director for Tremont, and his sole responsibility was to identify new business opportunities for Tremont in Arizona and the western part of the United States. *Id*.; Posorske Aff., at ¶2.

II.   Tremont's Introduction To The Defendant's

Sometime in the summer of 2003, Mr. Posorske had a discussion with an acquaintance, John Glasgow, during which Mr. Glasgow informed him that Grady, Lang, and their company, Pinnacle Development Group, were looking for assistance in finding financing for a contemplated development in Ventura, California, known as "The Ranch at Santa Paula" ("Ranch Project"). Mr. Glasgow had learned that information directly from Grady. *See*

3

Affidavit of Michael Grady, dated October 14, 2004 ("Grady Aff."), at ¶8 (in June or July, Grady "was discussing the [Ranch] Project and the financing needed with long-time friend, John Glasgow, CPA"). Grady had previously worked with Posorske and Fortis, and was familiar with him. *Id*. at ¶10. After Glasgow spoke with Posorske, Posorske called Grady to follow-up on the information Glasgow had passed along about the Ranch Project. *Id*. at ¶11; Posorske Aff., at ¶3.

      III.    <u>Negotiation and Formation of the Mortgage Banking Agreement</u>

From the initial discussion between Grady and Posorske, Psoroske concluded that the Ranch Project was a deal that would likely be attractive to Tremont. Posorske Aff., at ¶4. Posorske arranged to meet with Grady at Pinnacle's offices in Scottsdale. *Id*.; Grady Aff., at ¶¶12-13. Lang, and a project director, Greg Boyd, also attended the meeting. Grady Aff., at ¶13. During the meeting, Posorske reiterated what was known from the parties' previous interaction: that Posorske was not a mortgage banker, and had no experience in raising debt or equity for real estate owners. Posorske Aff., at ¶5; *See* Mee Aff., at ¶3 (Posorske's "experience was limited primarily to retail development"). Thus, to "pitch" the deal, Posorske focused on Tremont's reputation in that marketplace, and detailed the breadth of experience Tremont had in this area, its established connections to the lending community, as well as the qualifications of its management, including Mee and Gallitto. Posorske Aff., at ¶¶4-6. Posorske plainly stated that all of the work Tremont would perform on the Ranch project would take place in Massachusetts, at Tremont's Boston headquarters. *Id*. at ¶5.

After the initial meeting, Tremont's Boston-based personnel participated in two critical phone conversations to negotiate and finalize their contractual relationship. On August 14th, Posorske arranged a conference call to introduce Grady and Lang to Jared Lewis, Richard Gallitto, who would be the Tremont team assigned to the Ranch Project, if Tremont were

4

retained. Posorske Aff., at ¶8. Lewis is a Senior Underwriter at Tremont. Lewis Aff., at ¶2. The primary purpose of the August 14th call was to allow Grady to explain the details of the Ranch Project with Lewis and Gallitto because Lewis would be the lead underwriter/analyst for the project, and Gallitto would supervise him. Lewis Aff., at 6, *accord* Gallitto Aff., at ¶4; Posorske Aff., at ¶8. Tremont's representatives on the call were located in Boston, Massachusetts. Gallitto, at ¶4. Prior to the call, Pinnacle had already given Posorske a packet of initial information on the Ranch Project so that Lewis and Gallitto could gather a basic understanding before the call. Lewis Aff., at 6. During the teleconference, Gallitto stated that Tremont would only agree to provide its services if the parties agreed to an exclusive relationship because of the complexity of these deals, and the significant amount of time and resources Tremont was required to commit. Gallitto Aff., at ¶6; Lewis Aff., at ¶7; Posorske Aff., at ¶8.

In follow-up conversations between Posorske and Grady, it appeared that the issue of exclusivity was a sticking point. To address this and other outstanding issues, Posorske met with Grady and Lang in Grady's Scottsdale office, and arranged for them to speak, via telephone, with Dan Mee in Boston. Posorske Aff., at ¶9; Mee Aff., at ¶¶5-6. Mee re-emphasized that Tremont would spent so much time and so many resources in gearing up for the project, that it could only protect its investment by entering into an exclusive listing agreement. Mee Aff., at ¶6. After explaining the need for exclusivity, Mee went on to discuss related issues, such as what, if any, lenders would be carved out of the exclusive contract, and what break-up fee would be owed if a carved-out lender provided financing. Posorske Aff., at ¶9. During the call, Mee also negotiated the percentages for the fee structure, and whether Pinnacle would pay an up-front retainer to Tremont. *Id*.

After these phone conversations, Dan Mee drafted a Mortgage Banking Agreement ("MBA") on Tremont letterhead, and forwarded it to Posorske so that he could give it to Grady for review and comment. Mee Aff., at ¶7. The letterhead included the address information for Tremont's Boston headquarters. *See* Grady Aff., at Exhibit D. After some further discussion concerning the carve-outs, the MBA was executed on or about September 4, 2004, and was signed on Tremont's behalf by Dan Mee, not Russell Posorske. *Id*.

    IV.    Tremont's Performance Under the MBA Occurred
            Almost Exclusively In Massachusetts

After the August 14th conference call, Lewis, in his Boston office, started the preliminary steps in the underwriting process, and began to review and analyze the information that Pinnacle had already provided. Lewis Aff., at ¶8. Between August 14th and September 9th, Lewis reviewed financial statements, the borrower's background information, pro-forma statements, and any available third-party reports. *Id*. at ¶¶4,8. During the review, Lewis and Gallitto called Grady and Lang on several occasions to discuss the information, ask additional questions, and request additional information. Lewis Aff., at 8. On August 19th, Lewis sent Posorske a memorandum requesting additional information and materials from Pinnacle, which Posorske passed on; Pinnacle's reply was received, through Posorske, on August 21st. *id*. *See* Posorske Aff., at ¶11 (Posorske made it clear from the outset that any deal information he received from Pinnacle was passed on to Lewis and Gallitto).

Tremont completed its extensive due diligence/underwriting responsibilities, and issued a Financing Request Memorandum, which was submitted to potential capital providers beginning on or about September 9th. Lewis Aff., at ¶9. From September onward, the bulk of Tremont's work involved direct dialogue with potential capital providers, and Posorske had no involvement in those efforts. *Id*. *See* Posorske Aff., at ¶11 (once Lewis and Gallitto were involved, they

6

regularly communicated with Grady and Lang directly, sometimes with Posorske's participation, and sometimes not), *see generally* Mee Aff., at ¶8. Indeed, the initial deal as proposed by Pinnacle was not feasible, and Gallitto and Lewis worked with Fidelity Investments ("Fidelity") to construct a financeable deal. Gallitto Aff., at ¶8. Over the next several months, Lewis and Gallitto would arrange, and participate in, telephone conferences with Pinnacle and various potential lenders and investors. Lewis Aff., at 9. Posorske had no involvement in these activities either.

As a result of Tremont's efforts, Fidelity issued an investment proposal on or about December 19, 2003, which Grady accepted. Mee Aff., at ¶9. Fidelity committed $16.6 million in financing for the Ranch Project, with an anticipated closing sometime in early August. Gallitto Aff., at ¶9. In June, after further negotiations and changes to the deal structure, Fidelity committed $16.6 million in financing for the Ranch Project. *Id.*; Gallitto Aff., at ¶8. On July 25th, two weeks before the expected closing on the Fidelity financing, Neil Opper from Fidelity called Dan Mee to inform him that Grady had called Opper directly, and inform him that Pinnacle closed a financing deal with another lender. Mee Aff., at ¶10; Gallitto Aff., at ¶8. From an industry e-mail, Gallitto and Mee subsequently learned that the deal Pinnacle actually closed was identical to the deal structure that Tremont and Fidelity had put together after months of work. Gallitto Aff., at ¶9.

## **Argument**

Defendants' motion to dismiss is based on three flawed arguments. First, and primarily, defendants' assert that they dealt solely with Posorske in Arizona prior to execution, and that no Boston-based Tremont personnel participated in the negotiation that resulted in the signed contract. Second, defendants' claim that all pertinent events took place outside of

7

Massachusetts. Third, defendants note that their relationship, or contact, with Massachusetts relates solely to this one contract with Tremont. Each of the arguments is easily refuted.

As the affidavits that plaintiff submitted demonstrate, the defendants' statement that no Tremont representatives from Boston participated in the negotiations of the contract is simply untrue. Dan Mee, Rick Gallitto, and Jared Lewis did, and necessarily had to, participate in those discussions. As he readily acknowledges, Posorske did not have the experience, qualifications, or authorization to represent Tremont in those discussions. In any event, the nature of Tremont's performance, alone, supports personal jurisdiction here.

Defendants suggest, without explanation, that the alleged "breach," would have occurred in Arizona, not in Massachusetts. Again, that is simply incorrect, and utterly ignores the nature of the services performed in Massachusetts under the MBA. It is plain from the underlying facts that Tremont's Boston-based team and Pinnacle were in regular contact for almost an entire year, exchanging information and materials, and working with potential lenders and investors. All of Tremont's activity on these efforts occurred in Massachusetts, as was contemplated and understood by the parties.

Defendants' final argument disregards the well-settled principal that one contact is sufficient if it is of a quality to permit the constitutional exercise of jurisdiction, as is the case here. Moreover, it is equally well established that a parties physical presence in the forum state is not required as a prerequisite for the exercise of personal jurisdiction.

Looking beyond defendants' arguments, plaintiff has met its burden of making a *prima facie* showing that satisfies all three elements of the "minimum contacts" test under the 14th Amendment, and thus, the Court may exercise specific personal jurisdiction over the defendants

in this action.[1]  Accordingly, the exercise of jurisdiction also comports with Massachusetts' Long Arm Statute.  *See, e.g.*, *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 52 (1st Cir. 2002) (acknowledging the Supreme Judicial Court's interpretation of the long-arm statute as being co-extensive with the constitutional limits placed on jurisdiction).

It is transparent that the defendants think that they can receive the full measure and benefit of Tremont's service and work product, and avoid paying for them, because of the mistaken belief that plaintiff has no efficient forum to assert a claim.  Defendants cannot wield the Due Process Clause as a "territorial shield to avoid [their] interstate obligation."  *Pritzker v. Yari*, 42 F.3d 53, 61-61 (1st Cir. 1994).  "The jurisprudence of minimum contacts casts a wide net, and a nonresident defendant may not always be able to elude the net by such simple expedients as remaining physically outside the forum or limiting contact with the forum to a single commercial transaction."  *Id.* at 62.

## I. The "Relatedness" Prong Of The "Minimum Contacts" Test Is Satisfied Here Where the Dispute Is Directly Related To The Very Contract That Represents The Defendants' Forum-Related Activity.

The relatedness test is a relaxed and flexible standard.  *Lawson v. Affirmative Equities Company, L.P.*, 2004 WL 2397348 (D. Mass. Oct. 27, 2004) [publication page references unavailable]; *Pritzker*, 42 F.3d at 61.  Generally, in a contract case, the Court must first examine "whether the defendant's forum-based activities are 'instrumental in the formation of the contract'"  *Lawson,* 2004 WL 2397348 (quoting *Mass. Sch. of Law at Andover, Inc. v. American Bar Assoc.*, 142 F.3d 26, 35 (1st Cir. 1998)).  That is plainly the case here.  Grady and Lang educated themselves as to Tremont's abilities and expertise, and negotiated the key terms of the

---

[1] Plaintiffs do not argue that defendants are amenable to the general personal jurisdiction of this Court.

9

parties' agreement, directly in several phone conversations with Dan Mee, Rick Gallitto and Jared Lewis, all of whom were located in Boston.

Thus, here, it is "self-evident" that the present dispute over the legal implications of the MBA would not have arisen but for the existence of that contract. *Pritzker*, 42 F.3d at 61. The MBA is the product of defendants' forum-related activity and "is itself the cause and object of the lawsuit." *Id*. It is therefore, related.

Plaintiffs' associated tort claims for fraud and deceptive practices are likewise inextricably linked to the parties' negotiation of, and performance under, the MBA, and thus plaintiff's damages would not have occurred but for the defendants' forum-related activity. *Lawson*, 2004 WL 2397348. Thus, as the Court summarized in the *Lawson* decision, personal jurisdiction over the defendants extends to the tort claims as well.

> "'Logically, there is no reason why a tort cannot grow out of a contractual contact…[T]he contractual contact is a 'but for' causative factor for the tort since it [brings] the parties within tortuous 'striking distance' of each other.'" *Id*. (quoting *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 770 (1994)) [internal citations omitted]. As the court's personal jurisdiction in this diversity action is governed by the Supreme Judicial Court's interpretation of the Massachusetts long-arm statute, under the 'but for' test, jurisdiction attaches to both the contract and the related tort claims.

*Id*.

## II. Defendants' Purposefully Established Minimum Contacts In Massachusetts By Entering Into An Ongoing Contractual Relationship With A Massachusetts Business, Pursuant To Which Defendants' Knowingly Sought And Received The Benefits of Services Performed in Massachusetts.

Essentially, defendants' argument is that they did not purposefully avail themselves of the benefit of doing business in Massachusetts, and cannot, therefore, be subject to the Court's jurisdiction. To the contrary, there was nothing "random, isolated or fortuitous" about the defendants' contact forum-related activity. *See Sawtelle v. Farrell*, 70 F.3d 1381, 1391 (1st Cir.

1995) ("The function of the purposeful availment requirement is to assure that personal jurisdiction is not premised solely upon a defendant's 'random, isolated, or fortuitous' contacts with the forum state.") [internal citation omitted]. That conclusion is plain, not only from the activity that occurred prior to execution of the MBA; but, perhaps more significantly from continuous interaction and exchange of information contemplated and required to perform the obligations called for in the MBA.

Contrary to the defendants' assertion, the "minimum contacts" analysis is not concerned with the number of contacts, but rather the quality of the forum-related activity. As it is frequently articulated, the analysis is "not a numbers game, and "a single, meaningful contact with the forum, even by means of a virtual presence 'can fit the bill.'" *Lawson*, 2004 WL 2397348 (quoting *Pritzker*, 42 F.3d at 61). *See also Pritzker*, 42 F.3d at 60 (inquiry is "highly idiosyncratic, involving individualized assessment and factual analysis of the precise mix of contacts that characterize each case."). In a contract case, the Court should therefore concentrate not only on "prior negotiations," but also the "contemplated future consequences… the terms of the contract, and the *parties' actual course of dealing*." *See, e.g., Daynard*, 290 F.3d at 52 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1945)) [italics added].

It is significant that the discussions between the parties, as well as the plain terms of the MBA, establish that the contemplated relationship required regular and ongoing interaction between Tremont, in Massachusetts, and the Defendants, in Arizona, with a regular exchange of information between the parties. As stated in *Daynard* "[t]he Supreme Court, speaking on the subject of specific personal jurisdiction in contract cases, has 'emphasized that parties who "reach out beyond one state and create continuing relationships and obligations with citizens of

11

another state" are subject to regulation and sanctions in the other State for the consequences of their activities." 290 F.3d at 61 (quoting *Rudzewicz*, 471 U.S. at 473).

To that end, it is undisputable that defendants transmitted information to Tremont in Boston, and regularly communicated with Tremont in Boston, for almost a year until they secretly repudiated the Fidelity commitment. *See Sawtelle*, 70 F.3d at 1389-90 (the transmission of information into the forum state by telephone and mail is "unquestionably a contact"). It is also undisputed that all of Tremont's contracted-for services, including due diligence, underwriting, structuring the deal, and lender/investor introductions were performed by Tremont from its Boston headquarters. From August of 2003 until July of 2004, the defendants acknowledged and encouraged Tremont in those efforts, and accepting its work product.

The present facts are analogous to those found sufficient for jurisdictional purposes in *Daynard*, where a Massachusetts lawyer agreed to provide litigation assistance to an out-of-state law firm, and over the course of a continuing relationship developed litigation strategies, introduced the law firm to potential witnesses and contacts, furnished them with work product, and communicated regularly with the law firm, by various medium, to provide advice and assistance. *Daynard*, 290 F.3d at 46-47. Thus, as in *Daynard*, the present facts establish the two cornerstones of the the purposeful availment test: voluntariness and foreseeability. *Sawtelle*, 70 F.3d at 1391. *See also id*. at 1393 ("The enforcement of personal jurisdiction over a non-resident is foreseeable when that defendant has established a continuing obligation between itself and the forum state.") (citing *Rudzewicz*, 471 U.S. at 476). The *Daynard* court's concluding comments on the issue of purposeful availment apply with equal, or greater force, here,

> [e]ven in cases where the defendant was not physically present in the forum, where the defendant initiated the transaction by mailing or calling the plaintiff in

the forum and when the defendant contemplated that the plaintiff would render services in the forum, all as alleged by Daynard here, many courts have found jurisdiction."

290 F.3d at 61.

### III. Defendants' Failed To Articulate Any Unduly Onerous O Impossible Burden That Would Justify Dismissal, Or A Change Of Venue.

Defendants' argue that jurisdiction and venue in the District of Massachusetts is improper because defendant has 2-4 witnesses who reside in Arizona, and its documents are located mainly in its Scottsdale offices. That is of little significance for several reasons. First, plaintiffs can say the same thing. Dan Mee, Richard Gallitto, and Jared Lewis, at a minimum, are material witnesses, and all of Tremont's relevant documents are located in Boston. Indeed, if you consider the possibility of third-party discovery, the likelihood that extensive discovery will be needed from Fidelity, in Massachusetts, further supports jurisdiction and venue here.

The larger issue, however, is that defendants' have done nothing to meet the high standard set in this Circuit for the finding of an unduly onerous or impossible burden that would justify a change in venue. Indeed, as in *Lawson*, the defendants' are sophisticated business entities with real estate investments in a number of states, and are hard-pressed to show special or unusual burdens associated with defending the action in Massachusetts. Accordingly, no compelling reason exists to disregard the deference normally afforded to plaintiff's choice of forum. *Cambridge Literary Properties v. W. Goebel Porzellanfabrik G.m.b.H & Co.*, 295 F.3d 59, 66 (1st Cir. 2002); *Lawson*, 2004 WL 2397348.

Moreover, the defendants' argument that a finding of jurisdiction here will chill the Massachusetts economy is absurd on its face. To the contrary, in accordance with "social policies, Massachusetts has a substantial interest in redressing harms inflicted on its citizens by

13

out-of-state defendants as well as in providing a convenient forum in which its citizens may seek relief." *Lawson*, 2004 WL 2397348. Thus, personal jurisdiction over the parties, and venue, in this judicial district is reasonable and proper.

**Conclusion**

For these reasons, plaintiff requests that the Court deny the defendants' motion to dismiss this action for lack of personal jurisdiction, and reject the defendants' alternative request for a change of venue.

                TREMONT REALTY CAPITAL,

                By its attorneys,

                _____
                James M. Wodarski, BBO# 627036
                Michael S. Day, BBO # 656247
                Mintz, Levin, Cohn, Ferris, Glovsky
                  and Popeo, P.C.
                One Financial Center
                Boston, MA  02111
                (617) 542-6000

Dated:  December 3, 2004

**Certificate of Service**

    I certify that on this day I caused a true copy of this opposition memorandum to be served on defendants' counsel of record, William J. Hunt, Clark, Hunt & Emery, 55 Cambridge Parkway, Cambridge, Massachusetts 02142, by first class mail.

Dated:   December 3, 2004        _____
                                                     James M. Wodarski

LIT 1451036v3