IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TREMONT REALTY CAPITAL, INC.,

   Plaintiff,

v.

PINNACLE GROUP, LLC, ADAMS CANYON RANCH, LLC, JOHN LANG, and MICHAEL GRADY,

   Defendants.

Civil Action No. 04-11853-RGS

## AFFIDAVIT OF DANIEL O. MEE

I, Daniel O. Mee do hereby depose and state as follows:

1.    My name is Daniel O. Mee. I hold a Massachusetts Real Estate Brokers license and have actively worked in the real estate industry for more than 25 years. I earned a Bachelor of Arts degree in economics from Harvard University. I also earned an MBA degree from Harvard University.

2.    I am the Executive Director of Tremont Realty Capital, LLC ("Tremont"). Tremont is a Boston, Massachusetts-based real estate advisory firm that raises debt and equity for real estate owners and developers across the United States. Tremont has marketing representatives in six offices across the country and employs one analyst in Chicago, Illinois. Otherwise, all work performed by Tremont takes place in our Boston headquarters where I work.

3.      On or about May 1, 2003, Tremont hired Russell Posorske ("Posorske") to be a new marketing representative in Scottsdale, AZ. Posorske had no direct prior experience in raising debt or equity for third parties owning real estate. His experience was limited primarily to retail development. Tremont was familiar with Posorske's prior firm, Fortis Development ("Fortis"), and its principal, Ed Kobel. Posorske's relationship with Tremont is structured so that Posorske actually works for a joint venture called Tremont-Fortis, LLC. His sole responsibility in this role is to identify new business opportunities for Tremont. Tremont and Fortis share any net profits from transactions identified by Posorske equally. Tremont was comfortable with this arrangement since Posorske knew many people in the real estate industry and his job was simply to introduce his contacts to Tremont's services. All resulting transactions were managed in Boston, where the support staff and senior personnel are located.

4.      During the summer of 2003, Posorske indicated to Richard Gallitto ("Gallitto"), an Executive Director at Tremont, that he had an acquaintance named Michael Grady ("Grady") whose firm, Pinnacle Development ("Pinnacle"), was involved in many land development transactions. Posorske thereafter met with Grady, who identified several development transactions he was working on. Posorske made a presentation to Grady designed to secure for Tremont an exclusive mortgage banking listing on a development project known as The Ranch at Santa Paula, advertised as a 4,000+-acre residential golf community in Ventura County, California.

5.      From the outset of the discussions about a relationship between Tremont and Pinnacle, Grady communicated an anxiety to commit to an exclusive listing agreement with Tremont because of Posorske's lack of experience and resources in capital raising

duties. On several occasions prior to execution of the Mortgage Banking Agreement ("MBA") between Tremont and Pinnacle, both Gallitto and I participated in conference calls from our Boston office with Posorske and Grady in an effort to 1) explain Tremont's capability to Grady, and 2) explain why Tremont required an exclusive arrangement. We discussed, in detail: the types of transactions with which Tremont had experience; the types of capital providers Tremont would approach for this deal; and the type of presentation Tremont would put together on behalf of Pinnacle.

6. During these discussions, Grady explained to us that he was already discussing this deal with a few investors and wished that Tremont could simply show the transactions to a few additional investors. Together with Gallitto, I informed Grady that the effort Tremont expended in preparing a presentation was so extensive that, as a company, Tremont could not afford to gear up our staff to represent a deal unless there was a degree of certainty that we would be compensated. Further, Gallitto and I explained that we thought it would be unfair for Tremont to present a competitive capital offer to a developer, only to have that developer use Tremont's offer to secure a similar offer from another source and thereby attempt to circumvent paying Tremont. We explained that the only way to protect Tremont in the relationship contemplated with Pinnacle was through an exclusive listing agreement.

7. After further discussions with Grady, I drafted a proposed MBA and sent it to Posorske, instructing him to transmit the draft to Grady. Following some further negotiations about carve-outs to the exclusivity agreement and a proposed retainer fee, I

edited the original MBA and again sent Posorske the draft for transmittal to Grady. Pinnacle finally executed the MBA on Tremont letterhead on September 4, 2003.[1]

8.    Once Pinnacle executed the MBA outlining Tremont's role in the Ranch project, Tremont actively sought out and solicited appropriate capital providers. We assigned Jared Lewis ("Lewis"), a Senior Analyst, to the Pinnacle project and he subsequently prepared the presentation book under the supervision of Gallitto and myself. Tremont identified about a half-dozen potential investors and lenders and spent considerable time relaying the pros and cons of each of them with Grady. We ultimately identified Fidelity Investment ("Fidelity"), also based in Boston, as the investor with the best proposal for Pinnacle's needs.

9.    Through the work of Gallitto and Lewis, Tremont convinced Fidelity to issue an investment proposal to Pinnacle on December 19, 2003, which Grady accepted. Tremont then worked with Fidelity and Grady towards a closing of the deal. The specifics of the project underwent several changes, but on or about June 1, 2004, Fidelity committed to the $16,600,000 transaction and commenced legal work with Pinnacle's counsel to close the transaction.

10.   On July 25, 2004, approximately two weeks prior to the date expected for the Fidelity deal's closing, Neil Opper of Fidelity called me to tell me that he had just received a telephone call from Grady, who informed Mr. Opper that Pinnacle had just closed on the deal with another lender. I was shocked.

---

[1] Pinnacle executed another exclusive Mortgage Banking Agreement with Tremont for an entirely different development project less than six months later. The second MBA is attached as Exhibit A. Signed by Grady on March 23, 2004, this MBA concerned the securing of debt and equity capital for a golf course and residential development project located in Michigan and called Lockenheath. The March 23rd MBA contained identical fee structures as the MBA executed between Pinnacle and Tremont on September 4th, as well as a "break-up fee" and a carve-out provision. As with the September 4th MBA, all of the services rendered by Tremont for the Lockenheath MBA were performed in Boston.

4

11. I immediately called Posorske to relay the news to him and he thought I was joking. I instructed Posorske to call Grady and find out what was happening. Posorske called me back a few hours later and reported that Grady told him that he was sorry to have put everyone "through hoops" but that he liked the other deal better than Fidelity's. Posorske told me that Grady said he knew Pinnacle owed Tremont a $25,000 break-up fee and that they would pay this. I told Posorske that the break-up fee applied only to the two or three lenders identified in the MBA's carve-out section and that we were certain that Pinnacle did not close with any of them.

Signed under the pains and penalties of Perjury this _3rd_ day of December 2004.

_/s/ Daniel O. Mee_

Daniel O. Mee

**TREMONT**
**REALTY CAPITAL**
The Prudential Tower
800 Boylston Street, Suite 401
Boston, MA 02199

## MORTGAGE BANKING AGREEMENT

This Agreement between and among Tremont Realty Capital, Inc. (TREMONT) and John Lang, Michael Grady, the Pinnacle Group, LLC (Borrower) is made this Tuesday, March 23, 2004.

Whereas, TREMONT is a mortgage banker in the business of securing debt and equity capital for real estate and other ventures; and

Whereas, Borrower is seeking financing for a project or projects including, but not limited to, Lockenheath Golf Course and related residential development (Project);

Now therefore:

1. Borrower grants TREMONT the exclusive right to procure or arrange the subject financing. TREMONT shall work with Borrower and various providers of real estate capital (Capital Sources) to structure the financing.

2. TREMONT shall assist Borrower in compiling all required information on the Project to allow Capital Source(s) to effectively underwrite their investment. Borrower hereby assumes all liability for any errors and omissions in all information provided to Capital Sources defined herein.

3. TREMONT may provide introductions to Capital Sources and other services to Borrower. Introductions to Capital Sources shall be confirmed in the form of a letter, application, term sheet, conference call or meeting.

4. TREMONT shall earn a fee equal to one percent (1%) of the maximum loan amount of any senior debt financing, 3% of any mezzanine or 5% of any equity capital that is committed on the Project. In addition, TREMONT shall be due similar compensation for any financing with the introduced Capital Sources where Borrower is a party for any transaction committed within 36 months following the later of said introduction or Project loan closing. Said fee(s) shall be paid to TREMONT no later than the loan closing date.

5. Subject to the provision that follow-on financing be provided at competitive market rates, Borrower grants TREMONT the exclusive right to refinance the Project at stabilization. TREMONT's compensation for the future financing shall be as in Section 4 above, payable upon closing the future financing.

6. Borrower acknowledges that TREMONT has not made any representations regarding lenders, capital sources, or loan terms, and that Borrower has relied, and will rely, on it's own analysis and due diligence to make a determination regarding lenders, capital sources, and loan terms. Borrower agrees to hold TREMONT harmless for any claims arising from any transaction(s) from introduced capital sources.

7. This Agreement shall be binding on all the above Parties, related entities, their principals, employees and partners collectively and individually.

8. A facsimile of this document shall be deemed and considered as an original, binding, and enforceable document.

9. Entire Agreement. This Agreement supersedes any and all agreements, either oral or written, between the Parties. All Parties agree that no representations, inducements,

**TREMONT**
**REALTY CAPITAL**
The Prudential Tower
800 Boylston Street, Suite 400
Boston, MA 02199

promises, or agreements, oral or otherwise, have been made or relied upon by any party or anyone acting on behalf of any party, which are not embodied herein. Any modification of this agreement will be effective only if it is in writing and signed by all Parties.

10. *In the event Borrower should obtain and close on financing from a source not identified by Tremont, Borrower will pay to Tremont at time of loan closing, a breakup fee of $50,000.*

Agreed:

Date: 3.22.04

TREMONT Realty Capital, Inc.

By: _____
Daniel O. Mee, Executive Director

Date: 3/22/04

Borrower

By: _____
Michael Grady, Duly Authorized



## EXHIBIT A TO MORTGAGE BANKING AGREEMENT

The following lenders are excluded from the Mortgage Banking Agreement ("Agreement") between Pinnacle Group and Tremont in pursuit of financing for the Project LookenHeath Golf Course and related residential development. These lenders are registered by Pinnacle Group under the Mortgage Banking Agreement. Tremont shall be paid a breakup fee of $50,000 if any funding from these lenders is provided to the project.

Realty Investment Advisors
Sion Holdings

Tremont will receive a fee, as described in section 4 of the Agreement, for financing provided to the project from any other source.

Agreed:
Date: _____

Date: 5/18/04

TREMONT Realty Capital, Inc.

By: _____
Daniel Owen Mee, Executive Director

Borrower
By: _____
Michael Grady, Duly Authorized for Borrower