IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TREMONT REALTY CAPITAL, INC.,

   Plaintiff,

v.

PINNACLE GROUP, LLC, ADAMS
CANYON RANCH, LLC, JOHN LANG,
and MICHAEL GRADY,

   Defendants.

Civil Action No. 04-11853-RGS

## AFFIDAVIT OF RUSSELL L. POSORSKE

I, Russell L. Posorske, do hereby depose and state as follows:

1.    My name is Russell L. Posorske. I earned a Bachelor of Arts degree from the University of Illinois at Urbana-Champaign in 1980.

2.    I work for Tremont Realty Capital, LLC ("Tremont") as a Senior Director. I began working for Tremont in May 2003 and am based in Scottsdale, Arizona. Tremont is a real estate advisory firm headquartered in Boston, Massachusetts that specializes in raising debt and equity capital for real estate developers nationwide. In my role as Senior Director, I am responsible for identifying potential business opportunities for Tremont and developing relationships with companies or individuals who are seeking assistance in raising capital for real estate developments.

3.    During a conversation with an acquaintance of mine named John Glasgow ("Glasgow") sometime in 2003, I learned that Michael Grady ("Grady"), Michael Lang ("Lang") and their company, Pinnacle Development Group ("Pinnacle") might be

looking for a source of financing for a project they were developing in Ventura, California known as The Ranch at Santa Paula ("the Ranch project"). I knew both Grady and Lang personally, and contacted them to learn more specifics of the Ranch project. Glasgow had no further involvement with Tremont or me in the Ranch project.

4.     When it became clear to me that the Ranch project might be attractive to Tremont, I went to the Pinnacle offices and made a presentation outlining Tremont's success in raising capital for large real estate developments in August 2003. I provided Tremont marketing materials to Grady and Pinnacle and directed Pinnacle representatives, including Grady and Lang, to Tremont's internet website. I specifically discussed the careers of Tremont's Executive Directors, Daniel Mee ("Mee") and Richard Gallitto ("Gallitto"), who, I informed Grady and Lang, worked in Tremont's Boston headquarters. I highlighted Mee and Gallitto's experience in the real estate capital industry, including their educational backgrounds and breadth of contacts in the Boston financing market.

5.     From our prior interactions and from the specific discussions surrounding the Ranch project, Grady and Pinnacle were fully aware that I did not have any experience in raising capital and that I would not be involved in the project in any capacity other than as an intermediary for Pinnacle and Tremont. I specifically told Grady that I had never done this type of work, was not a mortgage banker, and could not handle a project of this scope on my own. I clearly and unequivocally informed Grady and Lang that all of the people performing the substantive work on the Ranch project would be located in Tremont's Boston headquarters.

6.     During the initial presentation, I expressly distinguished the expertise and depth of practice Tremont had in complex real estate capital financing from the lack of

2

experience and connections that I had in the area. I explained to Grady and Lang that I was unable to provide three things that were essential to the successful financing of the Ranch project: the technology and infrastructure required to put together a deal of this size and complexity; the contacts and access to the types of investors and lenders who could finance a deal of this size; and the experience, creativity, and knowledge required to pull together and finalize a deal of this nature.

7.      I informed Grady and Lang that, since I was personally based in Scottsdale, Pinnacle could count on me to insure that their needs and concerns were accurately communicated to Tremont's Boston headquarters. Grady and Lang knew that all of the manpower and resources of Tremont required for this work were based in the Boston headquarters.

8.      After Grady and Lang expressed interest in exploring a business relationship with Tremont, I traveled to Pinnacle's offices on August 14, 2003 to participate in a conference call between Grady and David Boyd ("Boyd") of Pinnacle and Gallitto and Jared Lewis ("Lewis") of Tremont. I re-iterated to Grady the fact that I was incapable of performing the work required to finance the Ranch project but that Gallitto and Lewis excelled at this type of work. We called Gallitto and Lewis in Tremont's Boston headquarters from Pinnacle's offices. Lewis and Gallitto told Grady and Boyd that they would be the individuals handling the underwriting and presentation of the Ranch project to potential investors and lenders. During this call, Lewis and Gallitto discussed the challenges and complexities of the financing and asked Grady and Boyd questions about specifics of the Ranch project. Gallitto also explained to Grady and Boyd during this call

Tremont's need for an exclusivity clause for Tremont's work in identifying and procuring financing for the Ranch project.

9. Subsequent to the August 14th phone call, Grady communicated to me his lack of enthusiasm for the exclusivity clause in any agreement between Pinnacle and Tremont. On or about August 18th, I once again traveled to Pinnacle's offices, where Grady and I again telephoned Tremont's Boston headquarters and spoke with Mee. Mee explained to Grady that Tremont was unwilling to perform any work for Pinnacle unless Pinnacle first executed an exclusive Mortgage Banking Agreement ("MBA") with Tremont. Mee further explained that, because of the amount of time and work the analysts at Tremont would have to invest in preparing the Ranch project as an attractive investment to potential lenders and investors, Tremont could not afford to begin work unless it was assured it would be compensated. The conversation also addressed the related issues, such as what capital sources would be carved-out from any exclusive relationship with Tremont, and the break-up fee to which Tremont would be entitled, in the event that one of the carve-out entities provided the financing. Mee also discussed the terms of the fee structure, and whether Pinnacle would pay Tremont an up-front retainer.

10. Based on these phone conversations, on August 19, 2003, Mee sent a draft MBA to me and instructed me to transmit it to Grady and Pinnacle for comment and review. I did so, and relayed comments and concerns about carve-out language and retainer fees back and forth until Grady finally executed the MBA on September 4, 2003.

11. As Gallitto and Lewis began the underwriting process and assembly of the financing proposals for potential investors and lenders, I remained involved with Pinnacle's representatives, helping to expedite communications between them Gallitto

4

and Lewis. I did not participate in any of the substantive work involved in underwriting the financing proposals or identifying potential investors or lenders for the Ranch project. Once Gallitto and Lewis were introduced to the deal, they regularly communicated with Grady, Lang and others at Pinnacle, sometimes with my participation, sometimes without my participation. Further, it was clear from the outset that any information or documents that Pinnacle provided to me would be passed on to Gallitto and Lewis, who were responsible for Tremont's work on the Ranch project.

12. On or about December 19, 2003, I was informed that Pinnacle accepted an investment proposal on the Ranch project from Fidelity Investments ("Fidelity"), a Boston-based investment firm. I continued to serve as a conduit between Pinnacle and Gallitto and Lewis for some documents and communications where needed as the financing progressed towards a final closing.

13. On or about July 25, 2004 I received a call from Mee. He informed me that Pinnacle was not proceeding with the closing with Fidelity and had, in fact, already closed on the Ranch project with a different lender. I expressed my doubts about the truth of Mee's information, and he instructed me to call Grady to find out what was happening.

14. I immediately telephoned Grady and asked him about Mee's suspicions. Grady told me that Pinnacle had, indeed, closed the financing for the Ranch project with another investor and that he was sorry to have put everyone "through hoops," but that the terms of the other deal was better for Pinnacle than Fidelity's terms. Grady also told me that he knew Pinnacle owed Tremont a $25,000 break-up fee and that they would pay this.

Signed under the pains and penalties of Perjury this _____ day of December 2004.

_____
Russell L. Posorske

Signed under the pains and penalties of Perjury this 3rd day of December 2004.

_____
Russell L. Posorske