IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TREMONT REALTY CAPITAL, INC.,

   Plaintiff,

v.

PINNACLE GROUP, LLC, ADAMS
CANYON RANCH, LLC, JOHN LANG,
and MICHAEL GRADY,

   Defendants.

Civil Action No. 04-11853-RGS

## AFFIDAVIT OF JARED R. LEWIS

I, Jared R. Lewis, do hereby depose and state as follows:

1. My name is Jared R. Lewis. I hold a Bachelor of Arts degree in Government from Harvard University and have worked in the real estate industry since 2000.

2. I am a Senior Underwriter for Tremont Realty Capital, LLC ("Tremont"). I have been a full-time employee of Tremont since August 2002. Prior to joining Tremont as a full time employee I worked for the firm as an intern and part-time employee, dating back to the summer of 2000. Tremont is a real estate advisory firm headquartered in Boston, Massachusetts that specializes in raising debt and equity capital for real estate developers nationwide. I have always worked in Tremont's Boston headquarters. In my role as Senior Underwriter, I report to Tremont's Executive Directors, Dan Mee ("Mee") and Rick Gallitto ("Gallitto").

3. My primary responsibility at Tremont is to underwrite, package, distribute and manage various debt and equity requests for our various origination offices throughout the United States. Typically, once one of Tremont's marketing representatives identifies a potential deal with a property developer, the marketing representative forwards all deal-specific information to my attention in the Boston office. The originating marketing representative and/or Gallitto and Mee will then review with me the information provided. If we determine that the proposed transaction is feasible, Tremont will execute a Mortgage Banking Agreement ("MBA.") with the developer and formalize Tremont's role in the process.

4. I commence the underwriting and packaging process when either the developer executes the MBA with Tremont or when Gallitto or Mee authorize me to do so. The underwriting and packaging process begins with the collection of information and documents relating to the transaction from the developer. Examples of these items include: the developer's financial statements; project budgets; pro-forma statements; any third-party reports available; borrower background information; market data; pictures; and any other materials relevant to procuring a loan or investment commitment for the subject transaction.

5. When the information-gathering process is near completion, I begin underwriting the transaction. To do this, I incorporate all of the budgetary and pro forma information provided into a financial model of the transaction that will lay out the terms of the deal and allow potential lenders or investors to easily determine the likely yield or return of their investment. Once I assemble the financial model, I package it, along with the supporting materials, into a document used in presentations to potential investors or lenders. This document, known as the Financing Request Memorandum, is generally 20-50 pages in length and includes all of the aforementioned information, as well as any other analysis conducted on the proposed project.

After internal review of the completed presentation, Tremont will distribute it to the lenders and investors it previously identified as suitable matches for the project. Once Tremont distributes the presentation, my primary role is to answer any questions from interested capital providers, to harvest proposals and quotes from them, and to work through any structuring/re-structuring necessary to procure a deal in the best interest of the borrower.

6. My principal involvement with the project known as the Ranch at Santa Paula ("the Ranch project") began on August 14th, 2003. On that date, Gallitto and I participated in a conference call from Tremont's Boston headquarters with Michael Grady ("Grady") and Greg Boyd from Pinnacle Development ("Pinnacle"). Russell Posorske, the Tremont marketing representative who generated the Pinnacle lead, also participated in the conference call. Prior to the conference call, I had already reviewed the initial information on the Ranch project submitted to Gallitto and had a basic understanding of the transaction. The primary purpose of the call was to allow Grady to explain the details of the Ranch project to Gallitto and me, since I would be the lead underwriter/analyst on the transaction and Gallitto would supervise my work. Gallitto and I covered some of the complexities of the deal with Grady and reviewed some of the critical deal points that would require extensive due diligence work from Tremont.

7. During the August 14th telephone discussion, Gallitto explained how complex the deal would be, and informed Grady that Tremont would insist on an exclusive listing arrangement with Pinnacle. Grady and Pinnacle were fully aware that Gallitto and me would conduct all underwriting, due diligence, packaging and coordinating duties for the presentation of the Financing Request Memorandum to potential capital providers. Grady and Pinnacle were also fully aware that Gallitto and me were located in Boston and that we would perform all of our work in Tremont's Boston offices.

8.  After the August 14th call, I commenced the underwriting of the transaction based upon the preliminary information already submitted by Pinnacle. Between August 14th and September 9th, Gallitto and I held occasional telephone conversations with either Grady or Michael Lang ("Lang") to discuss questions we had about certain documents or to request more information necessary to complete the underwriting process. I also drafted a memorandum listing the additional information I required for the Financing Request Memorandum. On August 19th I sent the memorandum to Posorske and instructed him to forward the list to Pinnacle. Pinnacle sent us their response on August 21st 2003, and I was then able to work towards the completion of my underwriting/packaging presentation for submission to prospective lenders and investors. The Financing Request Memorandum was completed on or about September 9th 2003, as that is the earliest record I have of submitting a request to a capital provider. Posorske did not participate in any of the underwriting efforts or in the assemblage of the Financing Request Memorandum.

9.  I spent the majority of my time in September 2003 forwarding the Financing Request Memorandum to prospective lenders and investors, answering any questions or comments from them and accumulating any additional information they requested. Posorske did not participate at all in these efforts. On October 8, 2003, I participated in a conference call between representatives from Boston-based Fidelity Investments ("Fidelity") and Pinnacle, which was conducted to introduce the parties and provide the Fidelity representatives with an opportunity to pose some deal-specific questions directly to the Pinnacle representatives. I participated in similar calls between Pinnacle representatives and other potential lenders and investors up until Fidelity issued a Term Sheet on December 16, 2003.

10. Once Fidelity issued the Term Sheet and Pinnacle accepted it, I served as a liaison between Pinnacle and Neal Opper ("Opper") of Fidelity. I worked closely with Opper to help resolve or answer any questions he had after Fidelity conducted further due diligence. While Opper had direct contact with Pinnacle at this stage, he continued to keep both Gallitto and me updated of the deal's progress throughout the due diligence process.

11. After months of due diligence and work to finalize the loan amount, Fidelity committed to the transaction. I was made aware of this commitment at in the second or third week of July 2004. Shortly thereafter, I was also made aware that Pinnacle had closed the subject transaction with a financing source different from Fidelity.

Signed under the pains and penalties of Perjury this __3__ day of December 2004.

_____
Jared R. Lewis