IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TREMONT REALTY CAPITAL, INC.,

   Plaintiff,

v.

PINNACLE GROUP, LLC, ADAMS
CANYON RANCH, LLC, JOHN LANG,
and MICHAEL GRADY,

   Defendants.

Civil Action No. 04-11853-RGS

## AFFIDAVIT OF RICHARD C. GALLITTO

I, Richard C. Gallitto, do hereby depose and state as follows:

1.    My name is Richard C. Gallitto. I have actively worked in the real estate industry for more than 25 years. I earned a Bachelor of Arts degree in economics from Harvard University.

2.    I am the Executive Director of Tremont Realty Capital, LLC ("Tremont"). Tremont is a Boston, Massachusetts-based real estate advisory firm that raises debt and equity for real estate owners and developers across the United States. Tremont has marketing representatives in six offices across the country and employs one analyst in Chicago, Illinois. Otherwise, all work performed by Tremont takes place in our Boston headquarters where I work.

3.    In early August 2003, Russell Posorske ("Posorske"), a marketing representative working for Tremont in Scottsdale, Arizona, introduced Michael Grady ("Grady") of

Pinnacle Development ("Pinnacle") to Tremont for the purpose of discussing a potential business relationship based on a proposed 4,000-acre development in Ventura County, CA called The Ranch at Santa Paula ("the Ranch"). Pinnacle was seeking assistance in raising the capital necessary to finance the development project.

4. After Posorske and Grady held preliminary discussions about the contemplated business relationship between Tremont and Pinnacle, they arranged for a conference call with analysts and managers of Tremont to discuss specifics of the project. Sitting in Tremont's Boston headquarters with Tremont's Dan Mee and Jared Lewis, I joined the call placed from Arizona by Grady and Greg Boyd of Pinnacle on August 14, 2003. Posorske also participated in this call. During this discussion, Grady informed me and the other participants that Pinnacle's goal was to secure zoning approvals that would enable Pinnacle to construct up to 400 house lots and a signature golf course on the Ranch. Grady also stated that Pinnacle, by existing rights, could alternatively develop 40 "ranchettes" (100-acre lots) on the Ranch that could be sold for a minimum of $1million per lot if they were not able to construct the proposed houses and golf course.

5. We informed Grady that Tremont was interested in raising the capital needed to refinance Pinnacle's existing debt as well as providing the capital required to carry the project through the 36 months that Pinnacle anticipated were required to get their final approvals. During that August 14th phone call, I indicated that the capital may come in the form of either senior debt, mezzanine debt or equity, depending on the manner in which an investor or lender would look to secure a senior position on the property.

6. I told Grady that Tremont was able to deliver premium service to its clients and highlighted the breadth of experience Tremont had in structuring large real estate capital

transactions. Additionally, I explained that, given the complexity of the assignment and the time that would be required by Tremont to arrange the capital, we would require Pinnacle to execute an exclusive mortgage banking agreement with Tremont to start the process.

7. During a meeting with Posorske at Pinnacle's offices a few days later, Grady called Tremont's Boston office to discuss the exclusivity clause with Dan Mee and me. Pinnacle ultimately executed the agreement with Tremont on September 4, 2003. Jared Lewis and I assumed the lead for Tremont on the Pinnacle work and we began to actively seek out appropriate capital providers. We prepared a detailed financing request package based on the proposed development project and submitted it to a number of potential investors and lenders over course of the following months. After we offered several proposals to Pinnacle, they selected Fidelity Investment ("Fidelity"), also a Boston, Massachusetts-based company, as the investor with the best proposal. On or about December 16, 2003, Jared Lewis and I convinced Fidelity to issue an investment proposal to Pinnacle. Grady accepted the proposal on Pinnacle's behalf. Jared Lewis and I performed all of the work for Pinnacle in Tremont's Boston headquarters.

8. Over the course of the following months, we discovered that the project, as originally conceived by Pinnacle, was not feasible. During the course of due diligence performed by Tremont and Fidelity, we uncovered the fact that base property rights in the Ranch required some additional approvals from the county, as well as control of an additional parcel that Pinnacle had under option, before any further development could proceed. Given the newfound risks associated with the transaction, Jared Lewis and I were forced to work with Pinnacle and Fidelity to create acceptable financing terms. On

or about June 1, 2004 Fidelity committed to the $16,600,000 transaction and commenced legal work with Pinnacle's counsel to close the transaction. On July 25, 2004, about two weeks prior to the date when we were expecting the deal between Fidelity and Pinnacle to close, Fidelity's Neil Opper called our office and told us that he had just received a call from Grady, who stated that Pinnacle had just closed with another lender.

9. Soon after that call, Tremont received a mass e-mail blast from George Smith Partners, a West Coast based mortgage-banking firm, announcing the financing of the Ranch project. A copy of that email is attached as Exhibit A. The terms of the deal were virtually identical to the deal structure that Tremont and Fidelity pieced together after months and months of work.

10. Dan Mee then contacted Grady and Pinnacle and informed them that we were still due a fee, pursuant to our exclusive mortgage broker agreement. Grady indicated that Pinnacle had no intention of paying Tremont for the services provided.

Signed under the pains and penalties of Perjury this ___3___ day of December 2004.


_____
Richard C. Gallitto

**David E. Ross**

From: Fin-Fax© [gspadmin@i-waysolutions.com]
Sent: Tuesday, August 10, 2004 6:00 PM
To: David Ross
Subject: Fin-Fax© - Volume XII, No. 13 - August 6, 2004

# GEORGE SMITH PARTNERS, INC.
Real Estate Financing and Consulting Services

Volume XII, No. 13                    GSP FIN-FAX©                    August 6, 2004

### KEY RATE INDICES

| | | | | | | **FANNIE MAE RATES *** | |
|---|---|---|---|---|---|---|---|
| Prime Rate | 4.25% | 5 Yr. U.S. T's | 3.38% | LIBOR - 1 mo. | 1.57% | Tier 2+ (80% LTV) | 5.49% |
| CODI* | 1.038% | 10 Yr. US T's | 4.22% | LIBOR - 3 mo. | 1.7 1% | Tier 3+ (65% LTV) | 5.35% |
| 3 Mo. T's (YTM) | 1.43% | 30 Yr. US T's | 5.03% | LIBOR - 6 mo. | 1.94% | Tier 4+ (55% LTV) | 5.21% |
| 6 Mo. T's (YTM) | 1.66% | 12-MAT | 1.463% | LIBOR - 1 yr. | 2.43% | 10 yr. term/30 yr. amort. | |

### TRANSACTION OF THE WEEK

**$23,000,000 Land Loan (100% of Cost, 56% LTV) for a 5,160 Acre Land Assemblage in Southern California Coastal Paine:** Use of Proceeds: Our client is a Scottsdale, AZ based developer of ultra exclusive, high amenity golf communities nationally. They were brought to joint venture a spectacular land assemblage. The operating concept for the property is to develop it into a very low density exclusive community with over 4,000 acres of private preserve. The amenities will include a Tom Weiskopf golf course, 19,000 s.f. club house and spa and a world-class equestrian facility. The "of right" entitlements allow for 39 ranches on the property. GSP/R was able to underwrite using the current of right density as the fall back to get the loan dollars needed. This financing facility (1) Pays off the existing $4.5 million of recourse debt - now due; (2) Returns $4.4 million of costs to the borrower that has been spent on the site to-date; and (3) Funds all remaining entitlement costs necessary to obtain 'paper-entitled lot' status. In addition, there is a commitment to fund 100% of the purchase of an additional parcel that will further add significant value to the package. **Structure:** The borrower will process entitlements for 2 possible scenarios simultaneously: for thirty-nine 160 acre "ranchettes" and another for four-hundred 10 acre luxury home sites. **Challenges:** (1) The 400 lot scenario projects lot inventory selling for between $1.2M and $3.0M to individual buyers. (2) The borrower had previously been unsuccessful in its effort to obtain entitlement for 2,100 small lots in 2002. GSP/Rifkind structured the dual-track entitlement requirement envisioning the "ranchettes" as a downside scenario, since the density approval needed for the ranchettes is an "entitlement of right." (3) The site had been sold to the borrower by an oil company that had retained the adjacent parcels, and there were potential environmental issues with respect to migration of oil related contaminants from the adjacent site. GSP/Rifkind was able to work with local engineers to calculate the potential risks. **Terms:** (1) **Rate: 12%;**

8/10/2004

EXHIBIT A

(2) **Term**: 60 months; (3) **Amort**: Interest Only; (4) Non-recourse; (5) No pre-payment penalty; (6) Non-participating. (David Rifkind, Michael Schwartz) Use GSP/Rifkind's quick-close capability to create value in your transaction. For more info, contact David Rifkind (ext. 130, drifkind@gspartners.com)

**$13,500,000 (80% LTV) Fixed Rate Financing for Acquisition of Grocer Anchored Shopping Center in California Central Valley**: Subject property is a 127,547 square foot retail center in the Central Valley of California. The property has 30 tenants and is 100% occupied. The grocer anchor is a regional brand, without an investment grade credit rating, and this location has had uneven sales over the past few years. The second largest tenant is a national "dollar" retailer that is operating on a sublease of an in-line space from a national drugstore. Challenges to the transaction included: (a) a sublease accounting for over 10% of the income at the property that was below the lease rate of the master lease; and (b) a significant amount of CAM reimbursement income for the property was attributable to an adjoining building (not part of collateral) that was formerly occupied by Kmart but was vacant at close and in arrears regarding its CAM obligations. **Financing**: (1) **Pricing**: 10-Year T + 1.20%; (2) **Term/Amort**: 10/30, with 2 years I/O; (3) **LTV**: 80%; (4) **DCR**: 1.20; (5) **Prepayment**: Defeasance; (6) Non-Recourse; (7) **Lender Fee**: Par. (Gary Mozer, Lee Norman, Larry Wilemon)

**$5,600,000 Non-Recourse Refinance for Cedars Sinai Adjacent Apartment, Los Angeles Property Specs**: 1985 built, 3-story apartment, 98%+ leased for several years, north of Burton Way in Beverly Hills, extremely well maintained, 48 space ground floor parking garage. All units are 650 s.f. "Junior 1 BR." Some of the units are leased as corporate styles units to Cedar Sinai medical personnel, patient's families and entertainment industry executives. Ten of the units are restricted to affordable rents via LA Housing Authority Agreement until July, 2005. **Special Requirement**: (1) Managing member required a loan with no personal recourse or carve out recourse because of his limited interest in the syndication; and (2) Loan must offer an earn out after the affordable units can be adjusted to market rents. **Loan Amount**: $5,600,000 with an initial funding of $5,000,000 and an earn out of $600,000. Interest paid only on funds disbursed. **Purpose**: Cash out to pay down investor interests and to establish an earn out as all rents continue to increase and the restricted rents adjust to market rents. **Terms**: (1) **Rate**: (a) 1st 5 years fixed at 5 year CMT + 1.90%, 5.75%, with the first two years interest only; the rate is then reset at the same index and spread for another 5 years or (b) Floating every 6 months at 12-MAT + 1.90%. Note: Borrower may choose to float for 2nd 5 years after being fixed for first 5 years. There is a 4.875% floor on the interest rate. (2) **Term/Amort**: 10/30; (3) **LTV**: 67%; (4) **DCR**: 1.20; (5) **Prepayment**: 5,4,3,2,1 in years 1-5 and years 6-10 using the fixed rate option (open last 6 months); no prepay penalty if the 12-MAT option is used in years 6-10; (6) **Lender Fee**:.50%; (7) **Recourse**: None; No personal or entity recourse for anything including carve outs; (8) **Earn Out**: Up to 24 months from funding and earn out of $600,000 of additional funds is available based on 3 months trailing NOI starting 7/1/04 subject to a continuing 1.20 DCR and 67% LTV. (Gene Brunkhardt)

8/10/2004