UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| TREMONT REALTY CAPITAL, INC., <br> Plaintiff, <br><br> v. <br><br> PINNACLE GROUP, LLC, ADAMS CANYON RANCH, LLC, JOHN LANG, and MICHAEL GRADY, <br> Defendants. | DOCKET NO. 04-11853-RGS |

**DEFENDANTS' MOTION FOR LEAVE TO FILE A REPLY BRIEF TO PLAINTIFF'S OPPOSITION TO ITS MOTION TO DISMISS**

Now come the defendants, Pinnacle Development Group-Santa Paula, LLC, Adams Canyon Ranch, LLC, John Lang, and Michael Grady (hereinafter collectively referred as "Defendants"), and move this Honorable Court to grant the Defendants leave to file a reply brief to plaintiff Tremont Realty Capital, Inc.'s ("Tremont") Opposition to Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2), or in the alternative, Motion for Transfer of Venue Pursuant to 28 U.S.C. § 1404(a).

As reason therefor, Defendants contend that Tremont's Opposition to Defendants' Motion to Dismiss contains factual inaccuracies. As cited in Defendants' Motion to Dismiss, the analysis to determine personal jurisdiction is "*specific to the facts presented....*" Aub v. Technicolor Entertainment Services, 224 F.Supp. 2d 371, 373 (D.Mass. 2002) [emphasis added]. As such, Defendant's reply brief is required for the Court to have all the accurate facts necessary for a just resolution to this matter.

In the event that this Court grants Defendants' motion for leave to file, Defendants hereby reply to Tremont's Opposition.

**A.   TREMONT'S UNSUBSTANTIATED ALLEGATIONS CONTAINED IN ITS MEMORANDUM IN OPPOSITION BELIE THE ACTUAL EVENTS THAT TOOK PLACE DURING THE BUSINESS RELATIONSHIP BETWEEN DEFENDANTS AND TREMONT.**

Without replicating all of Defendants' arguments as set forth in their Memorandum in Support of their Motion to Dismiss, Defendants find it significant to reiterate and highlight, for the Court, that it was Tremont, through its Arizona-based agent, Russell Posorske ("Posorske"), that left the Commonwealth of Massachusetts to initiate and solicit Defendants' business in Arizona. See Second Affidavit of Michael Grady (hereinafter "Grady Affidavit II"), ¶ 4. Tremont admits as much in its Memorandum in Opposition: "After Glasgow spoke with Posorske, *Posorske called Grady* to follow-up on the information Glasgow had passed along about the Ranch Project." Plaintiff's Memorandum in Opposition, p. 4, section II [emphasis added].[1] Tremont also makes the following allegations that need to be set straight or clarified:

1.   On page 1, Tremont alleges that "the contract contemplated and necessarily required the parties interact and communicate regularly between Defendants' office and Plaintiff's Boston office including a consistent exchange and transmission of information...." Defendants dispute this unsubstantiated allegation.

 (a)   Nowhere in the written agreement does it state that Defendants would have to communicate regularly with Tremont's Boston office. See generally, Mortgage Banking Agreement ("Agreement"), attached to Affidavit of Michael Grady ("Grady Affidavit") as Exhibit D.

---

[1] Also on page 3, Tremont admits that it solicits business outside of Massachusetts, by stating that Posorske's responsibilities included identifying new business opportunities for Tremont in Arizona and the western part of the United States. See Plaintiff's Memorandum in Opposition, p. 3, section I.

(b)   In addition, Tremont has six other offices throughout the United States, including one in Arizona. Defendants in Arizona were first contacted by Tremont's agent (Posorske) in Arizona from Tremont's Arizona office. Defendants had the bulk of their communications with Posorske in Arizona, even after the Agreement was signed. Prior to signing the Agreement, there was no reason for Defendants to believe or contemplate that they would have to communicate extensively with Tremont's Boston-based office, or any other Tremont office in the United States except for the one in Arizona. See Grady Affidavit II, ¶ 5.

2.   On pages 1-2, Tremont alleges that at all times, "including prior to the written contract's execution," Defendants were aware that all of Tremont's services "would be performed in Massachusetts ...." Tremont's allegation is unfounded and misleading. Defendants were never informed that the bulk of Tremont's services would be performed in Massachusetts. See Grady Affidavit II, ¶ 7. In fact, the opposite is true: Defendants dealt mostly with Posorske in Arizona, even after the execution of the Agreement. See Grady Affidavit II, ¶ 8. See also, copies of e-mails from Posorske to Defendants, attached to the Grady Affidavit as Exhibit E; copies of e-mail messages sent by Posorske to Defendants, attached to the Grady Affidavit as Exhibit C.

3.   At the top of page 2, Tremont alleges that Defendants were aware that its "one Arizona-based representative lacked the expertise, background, and authority to negotiate these points." Posorske represented himself to be a senior director with Tremont. When Defendants were instructed to visit Tremont's website, Posorske was listed on the website as a Senior Director with Tremont, and not as a "Marketing Representative." See Grady Affidavit II, ¶ 9. See also, printout of Posorske's mini-biography, as listed on Tremont's website as of 9/30/04, attached to Affidavit of

Armando Acosta as <u>Exhibit 1</u>. In addition, Tremont's own Memorandum in Opposition contains statements that belie this false allegation:

(a) Tremont admits that it formed a "joint venture named Tremont-Fortis, LLC" and that "under that joint venture, Mr. Posorske became a Senior Director for Tremont...." Using a reasonable businessman standard, a reasonable person in Defendants' position would have understood a "senior director" as someone who has some expertise, background, or authority on behalf of the company that he/she represents. <u>See</u> Grady Affidavit II, ¶ 10. Tremont, conveniently, now alleges that these individuals that it sends out throughout the country to solicit business on its behalf are merely "marketing representatives."[2]

(b) On page 4, section III, Tremont makes the statement that "from the initial discussion between Grady and Posorske, Psoroske (*sic*) concluded that the Ranch Project was a deal that would likely be attractive to Tremont." Without the expertise, background, or authority, how would a person in Posorske's position be able to conclude that the Ranch Project was a deal that would be attractive to Tremont, unless Posorske already had the requisite experience, background and ability to analyze the project?

(c) Significantly, neither Posorske nor anyone else from Tremont ever disclosed to Defendants that Posorske did not have expertise, background, or authority in this area. Tremont, in its sales pitch to Defendants, stated

---

[2] In addition, if Posorske lacked the requisite authority, background, and experience to handle these transactions, why would Tremont itself enter into a joint venture with Posorske and his company, instead of a simple marketing agreement?

that it, including Posorske, had the expertise and wanted Defendants to "work with this guy" (Posorske).[3]  See Grady Affidavit II, ¶ 11.

4. Tremont also alleges that "Posorske reiterated what was known from the parties' previous interaction: that Posorske was not a mortgage banker, and had no experience in raising debt or equity for real estate owners." Plaintiff's Memorandum in Opposition, p. 4, section III. Posorske's own mini-biography on Tremont's website belies this false allegation. See Exhibit 1.

   (a) Defendants have fully acknowledged that they have had previous interactions with Posorske prior to him forming a joint venture with Tremont. During that time, they had found Posorske to be extremely knowledgeable and well connected. See Grady Affidavit II, ¶ 12.

   (b) Defendants knew that Posorske and Fortis Advisors had gone to "Wall Street" and were able to generate hundreds of millions of dollars of investment money for their own (Fortis') real estate portfolios. See Exhibit 1. Accordingly, Defendants were armed with information that led them to believe that Posorske was quite capable of handling a project of this magnitude. See Grady Affidavit II, ¶ 13.

   (c) In addition, Defendants were aware that Posorske, as a member of Fortis, had obtained $450,000,000 in funds from Shearson Lehman Brothers'

---

[3] Apparently, Tremont now wants this Court to accept as true that when it makes a *sales pitch*, the first thing it tells a potential client in another state is that its main contact (in this case, Posorske) has no expertise, background, or authority to transact the business that he/she is soliciting. Further, Tremont wants this Court to accept as true that it informs all of its potential out-of-state clients that it must do all of their business via long-distance communications with its Boston headquarters, thereby exposing that out-of-state client to Massachusetts jurisdiction.

clients' investment monies, and invested it into real estate ventures in which Posorske himself had a financial interest. See Grady Affidavit II, ¶ 14.

(d) Prior to Defendants ever meeting anyone from Tremont, Posorske had brought a representative from General Motors Acceptance Corporation (GMAC) to Defendants' Arizona offices. See Grady Affidavit II, ¶15. GMAC is a significant lender in the real estate market and is a qualified, real source of development capital. See Grady Affidavit II, ¶ 16. To put it succinctly, Defendants believed Posorske to be qualified because of his past history and because Posorske was "running with the big boys" in the investment world.

5. On page 2 of its Memorandum in Opposition, Tremont also alleges that Defendants participated via a phone call "in the negotiation of the contract's key terms." This allegation is absolutely false. The substance of this telephone call was an explanation by Tremont on the merits of Tremont as a company. In short, it was Tremont's sales pitch. See Grady Affidavit II, ¶ 17.

6. With regard to the last paragraph on page 4, and the two critical phone conversations, the following facts are significant, which Tremont omits:[4] (i) Posorske arranged and initiated the conference call to Boston to introduce Defendants to Tremont (see Grady Affidavit II, ¶ 17); and (ii) while some of Tremont's representatives on the call "were located in Boston," not all Tremont agents were in Boston at the time of the call. Posorske, himself a Tremont representative, initiated the conference call from Arizona, and was a party to the call.

---

[4] Moreover, Tremont states that prior to the call, Defendants "had already given Posorske a packet of initial information," without mentioning that in order to analyze the deal that Posorske himself had solicited, Posorske needed and had requested this information.

-6-

7. Tremont also states, on page 5, that "to address this and other outstanding issues Posorske met with [Defendants] in [Defendants'] Scottsdale office and arranged for them to speak with Dan Mee in Boston." Defendants admit to this statement. Indeed, Tremont's Arizona-based agent did go to Defendants' Arizona office and while there, used Defendants' Arizona telephone to call other Tremont representatives in Massachusetts.

8. At the top of page 6, Tremont alleges that "after these phone conversations, Dan Mee drafted a Mortgage Banking Agreement ('MBA') on Tremont Letterhead, and forwarded it to Posorske so that he could give it to [Defendants] for review and comment."

   (a) First, Tremont, in this sentence, admits that its Arizona-based agent was the intermediary between the Defendants in Arizona and Tremont in Massachusetts, as argued by Defendants.[5] See Grady Affidavit II, ¶ 18.

   (b) Second, there were several drafts of the mortgage banking agreement, and most every time, Posorske himself received them from Massachusetts and then personally took them over to Defendants' office in Arizona, or forwarded the drafts from his Arizona office to Defendants' office for review. See Grady Affidavit II, ¶ 20.

   (c) Third, Posorske represented to Defendants that he (Posorske) was working in concert with Dan Mee in creating these documents. See Grady Affidavit II, ¶ 21.

---

[5] On page 6, section IV, Tremont again admits that Posorske was the intermediary between the Defendants and Tremont: "Lewis sent Posorske a memorandum requesting additional information and materials from [Defendants], *which Posorske passed on*; [Defendants'] *reply was received, through Posorske*, on August 21st." [emphasis added].

9. In section IV on page 6, Tremont alleges that "Lewis" started the preliminary steps in the underwriting process on August 14, 2003. Defendant disputes this allegation -- the underwriting process began when Defendants sat down with Posorske in Arizona and pored over, reviewed and analyzed, in detail, the package of items which Defendants had previously prepared and submitted to Posorske days earlier. Subsequent thereto, Posorske forwarded the package both to GMAC and on to Lewis in Boston. See Grady Affidavit II, ¶ 22.

10. In the same paragraph, Tremont states that "during the review, Lewis and Gallitto called [Defendants] on several occasions to discuss the information...." One of Defendants' main arguments against Massachusetts jurisdiction is that the bulk of the calls or other types of communications were always initiated by Tremont representatives in Boston to Defendants in Arizona. See Grady Affidavit II, ¶ 19. Tremont, in this sentence, essentially admits that Defendants' argument is true. Moreover, Posorske, while in Arizona, was included in the great majority of those calls.

11. At the bottom of page 6, Tremont alleges that "from September onward, the bulk of Tremont's work involved direct dialogue with potential capital providers, and Posorske had no involvement in those efforts." This allegation is absolutely false. Indeed, after Fidelity was sought out as a possible lending source, a few of Fidelity's representatives flew to California to "walk the property." See Grady Affidavit II, ¶ 23. Present at this critical and final "walk-through" was the representatives from Fidelity, the Defendants, and one Tremont representative. This sole Tremont representative was none other than its Arizona-based agent, Posorske. See Grady Affidavit II, ¶ 25.

    (a) The "walk-through" of the property in California by Fidelity was the final part in Fidelity completing its due diligence. Fidelity's senior representative was the person on the loan committee and the underwriting

committee who, from Defendants' perspective, had the final authority to okay or deny the loan on this project.  See Grady Affidavit II, ¶ 24.

(b) This walk-through was an absolutely critical stage of the proceedings, yet Tremont wants this Court to accept as true that it sent someone to that meeting (*i.e.*, Posorske) who had no experience, no background, or who had not been involved in the entire process of Defendants' and Tremont's dealings.  This event belies Tremont's allegation: if there was ever a time when Tremont needed to "put its best foot forward" to consummate the deal, it was at the California meeting with Fidelity.  Tellingly enough, Tremont sent Posorske to this California meeting, and not Lewis, Mee, or Gallitto.[6]

**B. CASES CITED BY TREMONT IN FAVOR OF FINDING JURISDICTION HAVE ONE IMPORTANT FACT IN COMMON THAT IS NOT PRESENT IN THE INSTANT MATTER: THE OUT-OF-STATE DEFENDANT(S) HAD SOLICITED THE BUSINESS OF THE FORUM STATE PLAINTIFF(S).**

Tremont, in its Memorandum in Opposition, cites the following:

As stated in *Daynard* "[t]he Supreme Court, speaking on the subject of specific personal jurisdiction in contract cases, has 'emphasized that **parties who "reach out beyond one state and create continuing relationships and obligations with citizens of another state**" are subject to regulation and sanctions in the other State for the consequences of their activities.  [Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 61 (1st Cir. 2002)], (quoting *Rudzewicz*, 471 U.S. at 473).

---

[6] On page 8, Tremont again alleges that Posorske did not have the requisite experience, qualifications, or authorization to represent Tremont in discussions.  Again, why would Tremont send Posorske to the most important meeting with Fidelity, and not Lewis, Mee, or Gallitto?

Plaintiff's Memorandum in Opposition, p.11-12.[7]

As set forth in its own Memorandum, Tremont itself admits that its own agent, Posorske, initiated the contact with Defendants in Arizona.[8] During this initial contact, Tremont's agent solicited and created a continuing relationship and obligation with Defendants, who are all Arizona citizens. Thus, as can be gleaned from Tremont's own clear language, Tremont admits that it was the one that reached out beyond the Massachusetts borders to solicit business from Arizona residents. Now, Tremont attempts to argue that Defendants should be the ones who are subject to Massachusetts law, instead of the other way around, and in the process, turning the jurisdictional analysis on its head.

---

[7] Tremont again cites Daynard on p. 12-13 of its Memorandum:

> [e]ven in cases where the defendant was not physically present in the forum, **where the defendant initiated the transaction** by mailing or calling the plaintiff in the forum and when the defendant contemplated that the plaintiff would render services in the forum, all as alleged by Daynard here, many courts have found jurisdiction.

290 F.3d at 62 [emphasis added]. The instant matter is clearly distinguishable from Daynard, as Defendants did not initiate the transaction in Massachusetts. The Daynard Court went on to hold that, "against the backdrop of the Scruggs defendants' **direct contacts** with Massachusetts" (290 F.3d at 63) (one of these direct contacts included a visit by defendant representative to Massachusetts), "by knowingly accepting the benefits of the transaction **initiated in Massachusetts**, the Scruggs defendants ratified Patrick's act of hiring and retaining [plaintiff] on behalf of both firms, which ultimately gave rise to this law suit." 290 F.3d at 60 [emphasis added]. Thus, the First Circuit recognizes that a main factor in finding jurisdiction is the initiation and solicitation of business by the out-of-state defendant in the forum state. That is not the case here.

[8] From Plaintiff's Memorandum in Opposition, p. 4, sections II-III:

> After Glasgow spoke with Posorske, **Posorske called Grady** to follow-up on the information Glasgow had passed along about the Ranch Project. Id. at ¶11; Posorske Aff., at ¶3.
> ...
> From the initial discussion between Grady and Posorske, Psoroske (sic) concluded that the Ranch Project was a deal that would likely be attractive to Tremont. Posorske Aff., at ¶4. **Posorske arranged to meet with Grady at Pinnacle's offices in Scottsdale.** Id.

[emphasis added].

Tremont cites another case where the out-of-state defendant(s) initiated and solicited business from the Massachusetts residents.  See, e.g., Lawson v. Affirmative Equities Company, L.P., 341 F. Supp. 2d 51, 59-60 (D.Mass. 2004) ("According to [plaintiff], [the out-of-state defendant] '*solicited* the guarantees from the Trusts *in Massachusetts*, and remained directly in the middle of the negotiation and post-transaction communications with [plaintiff]' "; and "[the other out-of-state defendant] for his part, *admits meeting with [plaintiff] in Massachusetts* in late 2001 ... to discuss the status of The Patrick Henry Hotel, the Agreement of Guaranty, and the Demand Note,...") [emphasis added].

In addition, another case cited by Tremont is clearly distinguishable from the instant matter (see, e.g., Pritzker v. Yari, 42 F.3d 53, 62 (1st Cir. 1994) (where the First Circuit found jurisdiction because the out-of-state defendant, "by knowingly acquiring an economically beneficial interest in the outcome of a Puerto Rico-based lawsuit that involved control over property located in Puerto Rico, necessarily exhibited sufficient minimum contacts to subject it to the district court's exercise of specific in personam jurisdiction")), and yet another case aids Defendants' position against finding jurisdiction (see, e.g., Sawtelle v. Farrell, 70 F.3d 1381, 1396 (1st Cir. 1995) (where the First Circuit held that the out-of-state defendant "law firms' telephone communications and correspondence into the forum did not represent a 'purposeful availment' by the firms of the privilege of conducting business activities in New Hampshire")).

## CONCLUSION

Tremont's unsubstantiated allegations belie the actual events that took place, and do not make out a *prima facie* case that personal jurisdiction is warranted in the instant matter. Thus, Defendants' Motion to Dismiss must be granted.

Respectfully submitted,

**CLARK, HUNT & EMBRY**

/s/ Armando Acosta
---
William J. Hunt (BBO # 244720)
Armando J. Acosta (BBO # 648242)
55 Cambridge Parkway
Cambridge, MA 02142
(617) 494-1920

Date: January 28, 2005