UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| TREMONT REALTY CAPITAL, INC.,<br>Plaintiff,<br><br>v.<br><br>PINNACLE GROUP, LLC, ADAMS<br>CANYON RANCH, LLC, JOHN LANG,<br>and MICHAEL GRADY,<br>Defendants. | DOCKET NO. 04-11853-RGS |

### SECOND AFFIDAVIT OF MICHAEL GRADY

I, MICHAEL GRADY, having been first duly sworn upon my oath, hereby depose and state as follows:

1. I am making this affidavit in support of Defendants' Reply Brief to Plaintiff's Opposition to Its Motion to Dismiss. It is for this purpose ONLY, and any statements contained herein should not be construed as a waiver of our challenge to personal jurisdiction over me, or any of the other defendants, by the United States District Court, District of Massachusetts.

2. I have personal knowledge of all matters that I testify to herein, unless I specifically represent that said matters are testified to "upon information and belief."

3. Upon information and belief, plaintiff Tremont Realty Capital, Inc. ("Tremont") has six out-of-state offices and agents that solicit business throughout the United States on behalf of Tremont.

4. Tremont, through its Arizona-based agent, Russell Posorske ("Posorske"), initiated the contact and solicited Pinnacle Development Group-Santa Paula, LLC's,

Adams Canyon Ranch, LLC's, John Lang's ("Lang"), and my business in Arizona. This business is the subject matter of the instant litigation.

5. Lang and I had the bulk of our communications and negotiations with Posorske in Arizona. We were never informed by Posorske, nor was there any reason for us to believe or contemplate, that we would have to communicate extensively with Tremont's Boston-based office, or any other Tremont office in the United States except for the one in Arizona.

6. In addition, the written agreement does not set forth that we would have to communicate regularly with Tremont's Boston office. See generally, Mortgage Banking Agreement ("Agreement"), attached to the Affidavit of Michael Grady ("Grady Affidavit") as Exhibit D.

7. Nor were we ever informed, either prior to or subsequent to the Agreement's execution, that all of Tremont's services "would be performed in Massachusetts...."

8. Lang and I dealt mostly with Posorske in Arizona, even after the execution of the Agreement. See copies of e-mails from Posorske to Defendants, attached to the Grady Affidavit as Exhibit E; see also, copies of e-mail messages sent by Posorske to Defendants, attached to the Grady Affidavit as Exhibit C.

9. Posorske represented himself to be a senior director with Tremont. When we were asked to visit Tremont's website as part of Posorske's sales pitch, Posorske was listed on the website as a Senior Director with Tremont, and not as a "Marketing Representative." See printout of Posorske's mini-biography, as listed on Tremont's website as of 9/30/04, attached to the Affidavit of Armando Acosta as Exhibit 1.

10. Lang and I understood a "senior director" to be someone who has some expertise, background, or authority on behalf of the company that he/she represents.

11.  Significantly, neither Posorske nor anyone else from Tremont ever disclosed to Lang or I that Posorske did not have expertise, background, or authority in this area. Tremont, during its sales pitch to us, stated that it, including Posorske, had the expertise and wanted Defendants to work with Posorske.

12.  During our past business dealings with Posorske, prior to him forming a joint venture with Tremont, Lang and I found Posorske to be extremely knowledgeable and well-connected, relative to Wall Street financing sources and real estate development.

13.  Lang and I knew that Posorske and his former company, Fortis Advisors, had gone to "Wall Street" and were able to generate hundreds of millions of dollars of investment money for their own real estate portfolios. Thus, Lang and I believed that Posorske was quite capable of handling a project of this magnitude.

14.  Lang and I were aware that Posorske had obtained $450,000,000 in funds from Shearson Lehman Brothers' clients' investment monies, and invested it into real estate ventures that involved Posorske himself.

15.  In addition, prior to Lang and I ever meeting anyone from Tremont, Posorske had introduced us to a representative from General Motors Acceptance Corporation (GMAC).

16.  Upon information and belief, GMAC is a significant lender in the real estate market and is a qualified, real source of development capital.

17.  Posorske arranged and initiated a conference call, from our Arizona office, to Massachusetts to introduce us to some of Tremont's representatives in Massachusetts.

18.  The bulk of the communications between Defendants and Tremont were between Lang, Posorske, and myself. Posorske acted as an intermediary between

Tremont representatives in Massachusetts and Lang and I in Arizona. <u>See</u> copies of e-mails from Posorske to Defendants, attached to the Grady Affidavit as <u>Exhibit E</u>; copies of e-mail messages sent by Posorske to Defendants attached to the Grady Affidavit as <u>Exhibit C</u>.

19. Most, if not all, of the other communications with Tremont representatives were always initiated by Tremont representatives in Boston to Lang or me in Arizona. In addition, Posorske, while in Arizona, was included in the great majority of those calls.

20. There were several drafts of the Agreement, and most of the time, if not all the time, Posorske himself received them from Massachusetts and then personally brought the drafts to my office in Arizona, or forwarded the drafts from his Arizona office to my office for review.

21. At all times, Posorske represented to me that he was working in concert with Dan Mee in creating these documents.

22. In my opinion, the underwriting process began when Lang and I sat down with Posorske in Arizona and pored over, reviewed and analyzed, in detail, the package of items which Lang and I had previously prepared and submitted to Posorske days earlier. Subsequent thereto, Posorske forwarded the package both to GMAC and on to Lewis in Boston.

23. Subsequent to Fidelity being sought out as a possible lending source, a few of Fidelity's representatives flew to California to "walk the property."

24. Upon information and belief, the "walk-through" of the property in California by Fidelity was the final part in Fidelity completing its due diligence. Fidelity's senior representative was the person on the loan committee and the

underwriting committee who, in my opinion, had the final authority to okay or deny the loan on this project.

25.     I was present at this critical "walk-through," as well as the representatives from Fidelity, and *Tremont's sole representative*, Posorske.


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY, this 28th day of January 2005.

/s/ Michael Grady
_____
MICHAEL GRADY