## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

TREMONT REALTY CAPITAL, INC., a
Massachusetts Corporation,
     Plaintiff,

v.

PINNACLE GROUP, LLC, an Arizona limited
liability company; ADAMS CANYON RANCH,
LLC, an Arizona limited liability company;
JOHN LANG, an individual; and MICHAEL
GRADY, an individual,
     Defendants,
and
_____

PINNACLE GROUP, LLC, an Arizona limited
liability company; ADAMS CANYON RANCH,
LLC, an Arizona limited liability company;
JOHN LANG, an individual; and MICHAEL
GRADY, an individual,
     Counterclaimants,

v.

TREMONT REALTY CAPITAL, INC., a
Massachusetts Corporation,
     Counter-Defendant,
and
_____

PINNACLE GROUP, LLC, an Arizona limited
liability company; ADAMS CANYON RANCH,
LLC, an Arizona limited liability company;
JOHN LANG, an individual; and MICHAEL
GRADY, an individual,
     Third-Party Plaintiffs,

v.

FORTIS ADVISORS, LLC, an Arizona
limited liability company; TREMONT-FORTIS
REALTY CAPITAL, LLC, an unknown entity;
RUSSELL POSORSKE, an individual;
RICHARD C. GALLITTO, an individual;
DANIEL O. MEE, an individual,
     Third-Party Defendants.

**Case No.  04-11853-RGS**

**COUNTERCLAIMANTS' <u>OPPOSITION</u>
TO TREMONT REALTY CAPITAL,
INC.'S MOTION TO DISMISS
COUNTS I, II, III, AND VI OF THE
FIRST AMENDED COUNTERCLAIM;
<u>MOTION FOR LEAVE TO AMEND</u>
THE FIRST AMENDED
COUNTERCLAIM;
<u>OR</u>, *IN THE ALTERNATIVE,*
COUNTERCLAIMANTS' <u>CROSS-
MOTION TO DISMISS</u> COUNTS IV
AND IV (*sic*) OF TREMONT REALTY
CAPITAL, INC.'S COMPLAINT, <u>AND
REQUEST FOR HEARING</u>**

Now come the Defendants and Counterclaimants Pinnacle Group, LLC

("Pinnacle"), Adams Canyon Ranch, LLC ("Adams Canyon"), John Lang ("Lang"), and

Michael Grady ("Grady") (Pinnacle, Adams Canyon, Lang and Grady are all hereafter

collectively referred to as "Counterclaimants" or "Pinnacle"), and hereby oppose the Plaintiff/Counterclaim Defendant Tremont Realty Capital, Inc.'s (hereinafter "Tremont") Motion to Dismiss Counts I, II, III, and VI of the First Amended Counterclaim. In the event that this Court finds that Pinnacle did not plead its fraud counterclaims with particularity, pursuant to Fed. R. Civ. P. 15(a), Pinnacle hereby moves for leave to amend its First Amended Counterclaim.

In the alternative, Pinnacle hereby incorporates by reference, *and adopts*, all of Tremont's arguments and case law cited in Tremont's Motion to Dismiss, and for the same reasons, Pinnacle hereby cross-moves to dismiss Counts IV and IV (*sic*) of Tremont's Complaint for failure to plead these two fraud claims with particularity.

In support of this Opposition/Motion for Leave to Amend/Cross-Motion to Dismiss, Pinnacle submits the following:

I.     **OPPOSITION TO TREMONT REALTY CAPITAL, INC.'S MOTION TO DISMISS COUNTS I, II, III, AND VI OF THE FIRST AMENDED COUNTERCLAIM**

**STATEMENT OF THE CASE**

This action arises out of the Counterclaimants' relationship with Tremont in connection with their efforts to obtain specific financing for a major real estate development project in Southern California. Tremont has claimed, without basis, that it is entitled to a brokerage fee based on a Mortgage Banking Agreement between the parties. (Plaintiffs' Complaint, ¶¶ 9-24). Where Tremont failed to provide the subject financing as agreed by the parties and breached its obligations under the Agreement, the Counterclaimants have refused to pay the brokerage fee. Given Tremont's breach of contract and the fact that Tremont induced the Counterclaimants to enter into the Agreement by making numerous false representations, the Counterclaimants filed counterclaims against Tremont alleging fraud, consumer fraud, violation of M.G.L. c.

2

93A, negligence, breach of contract, and seeking declaratory judgment.

Tremont's argument that this action involves a straightforward breach of contract claim is belied by the pleadings filed by the parties in this matter and ignores the substance of the allegations in the counterclaims. Pinnacle's fraud counterclaims arise out of the same transaction or occurrence that is the subject matter of Tremont's Complaint. Tremont, thus, has had adequate notice of these fraud counterclaims, and the particular details that constitute these fraud counterclaims, because Tremont makes nearly the same fraud claims and allegations in its own Complaint. In fact, the fraud claims in Tremont's Complaint and Pinnacle's First Amended Counterclaim are nearly identical. As such, if this Court finds that Pinnacle's counterclaims have not been pleaded with sufficient particularity so as to survive Fed. R. Civ. P. 9(b) scrutiny, then for the same reasons, it stands that Tremont's fraud claims are not pleaded with sufficient particularity, and thus, this Court must also dismiss Tremont's fraud claims.

## ARGUMENT

A.   **Pinnacle has achieved the main purpose of Fed. R. Civ. P. 9(b), which is to give Tremont adequate notice of the fraud counterclaims brought against it.**

Federal Rule of Civil Procedure 9(b) dictates that fraud claims must be alleged with particularity. The party alleging fraud must specify (1) the allegedly fraudulent statements; (2) the identity of the speaker; (3) where and when the statements were made; and (4) why the statements were fraudulent. See Curtis v. Duffy, 742 F. Supp. 34, 38 (D. Mass. 1990); see also, Lawson v. Affirmative Equities Co., L.P., 341 F. Supp. 2d 51, 66 n.22 (D. Mass. 2004), quoting McGinty v. Beranger Volkswagen, Inc., 633 F.2d 226, 228 (1st Cir. 1980) (the First Circuit has interpreted the Rule to require "specification of the time, place, and content of an alleged false representation," in short, the "who, what, when, and where," requirements of Rule 9(b)).

3

One of the main goals of Rule 9(b) is "to provide a defendant with fair notice of a plaintiff's claim … ." Suna v. Bailey Corp., 107 F.3d 64, 68 (1st Cir. 1997), citing Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (1st Cir. 1994). See also, Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996) (Rule 9 imposes a heightened pleading requirement for allegations of fraud in order to give notice to defendants of the plaintiffs' claim); New England Data Services, Inc. v. Becher, 829 F.2d 286, 289 (1st Cir. 1987) (one purpose behind Rule 9(b)'s particularity requirement is to place the defendants on notice and enable them to prepare meaningful responses); Hayduk v. Lanna, 775 F.2d 441, 443 (1st Cir. 1985) (one purpose of the rule is to give the defendant adequate notice of the fraud claim); Health Plans v. New York Life Ins. Co., 898 F. Supp. 941, 948 (D. Mass. 1995) (the main purpose of Rule 9(b) is to give notice to the defendant of the fraudulent claims against it).

The facts presented in Pinnacle's First Amended Counterclaim clearly give Tremont adequate notice of Pinnacle's fraud counterclaims, and the particular details that constitute these fraud claims, as Tremont makes essentially the same fraud claims and allegations in its Complaint as Pinnacle makes in its First Amended Counterclaim. Pinnacle's fraud counterclaims arise out of the same "transaction or occurrence that is the subject matter of" Tremont's Complaint. (See Fed. R. Civ. P. 13(a)). Therefore, Tremont has had adequate notice of the fraud counterclaims brought against it, and this Court must deny Tremont's Motion to Dismiss.

**B.** **Pinnacle pleads, with particularity, that Tremont, a corporation, spoke and acted through its corporate officers, and that Pinnacle similarly spoke and acted through its corporate officers.**

It is well-settled that a corporation, while an existing legal entity, cannot act or speak, but through its corporate officers or directors. See Bird v. Centennial Ins. Co., 11 F.3d 228, 233 (1st Cir. 1993), citing Matter of World Hospitality Ltd., 983 F.2d 650, 652 (5th Cir. 1993); see also, Commonwealth v. Beneficial Finance Co., 360 Mass. 188,

264, cert. denied, 407 U.S. 910 (1971).  Tremont argues in its Motion to Dismiss that

Pinnacle never identifies the parties who allegedly made the fraudulent statements.

*However*, Tremont ignores the following:

> [a]t all times material hereto ... *Tremont acted through* its authorized
> directors, officers, members, partners, representatives and agents
> including, but not limited to, Daniel O. Mee ('Mee'), Richard C. Gallitto
> ('Gallitto'), and Russell Posorske ('Posorske').

(Amended Counterclaims, ¶ 7).[1]  Similarly and logically, Pinnacle cannot act but

through its duly authorized corporate officers and directors, Lang and Grady.  Thus,

when Tremont made its fraudulent statements, it made them through Mee, Gallitto,

and Posorske, and when Pinnacle heard these fraudulent statements, it heard them

through Lang and Grady.

In addition, Pinnacle specifically points out that one of Tremont's agents and

directors, Posorske, "***misrepresented*** that he was quite capable of handling a project of

the magnitude of the one for which Counterclaimants were seeking the 'subject

financing.'"  (Amended Counterclaims, ¶ 17 [emphasis added]).  Thus, at the very least,

Pinnacle has pleaded that Posorske, specifically, misstated his qualifications and

background so as to induce Pinnacle to enter into an exclusive agreement with

Tremont.  Thus, Pinnacle has satisfied the "who" element of the Rule 9(b) requirements.

**C.    Pinnacle's fraud counterclaims make clear why Tremont's representations were fraudulent.**

Pinnacle clearly sets forth, and delineates in its Amended Counterclaims, the

fraudulent statements made by Tremont during the negotiations leading up to the

execution of the Mortgage Banking Agreement (hereinafter "MBA") between the parties.

Specifically, Pinnacle has pleaded that Tremont (*acting through* Posorske, Gallitto, Mee)

---

[1] Pinnacle does not have to identify, within the same paragraph, the "who, what, where, and when" elements of Rule 9(b), as it does so in other sections of the Amended Counterclaims, and adopts them by reference in those same parts of the Amended Counterclaims.  See, e.g., Learning Express, Inc. v. Ray-Matt Enters., 74 F. Supp. 2d 79, 86-87 (D. Mass. 1999), quoting Fed. R. Civ. P. 10(c) ("statements in a pleading may be adopted by reference in a different part

made the following misrepresentations to Pinnacle (*acting through* Lang and Grady):

    a.    That Posorske was extremely knowledgeable and experienced in obtaining financing of the magnitude, scope and nature of the "subject financing" ...;

    b.    That Tremont could (and would) utilize commercially reasonable efforts to secure for the Counterclaimants the 'subject financing' (*i.e.*, financing for the project which met all of the terms and parameters ...);

    c.    That the subject financing could be obtained by Tremont for Counterclaimants in a timely fashion and in a commercially reasonable time frame and manner; and

    d.    That one of Tremont's most senior and experienced individuals (*i.e.*, Gallitto) would be the "lead" or "point person" who would primarily take the most active role in contacting potential funding sources, negotiating and dealing with said potential funding sources, and finalizing and consummating the ultimate obtainment of the subject financing ... .

(Amended Counterclaims, ¶ 24(a-d)). In the next few paragraphs of the First Amended Counterclaim, Pinnacle went on to plead, *with particularity*, what made these representations fraudulent:

[a]t the time that Tremont made these various representations to Counterclaimants, ***Tremont knew that said representations were false, including***, ...,

[i] the fact that *Tremont did not (and never intended) to allocate its work product* in such a fashion as to cause Gallitto to be the lead person on this Project, but instead Tremont assigned Posorske the responsibility for being the lead person for securing the "subject financing"; ...

[ii] *Tremont knew that it could not obtain financing ... in accordance with the terms and condition*s which comprised the "subject financing";

[iii] ... *Tremont misrepresented the skill, knowledge, experience and background level and abilities of Posorske* relative to Posorske's ability to obtain financing ... which would comport with the 'subject financing' which Counterclaimants were seeking.

(Amended Counterclaims, ¶ 26 [emphasis added]). In addition, Pinnacle pleaded that "the actions of Tremont were calculated to obtain the benefits provided by the Counterclaimants under the Agreement ... *without Tremont having to provide Counterclaimants with the consideration promised under the Agreement.*" (Amended

of the same pleading ...").

Counterclaims, ¶ 35 [emphasis added]).

Pinnacle further pleaded that it relied on the misrepresentations made by the Tremont representatives, and that its reliance was reasonable:[2] "...Counterclaimants would never have agreed to the exclusivity provision in the Agreement with Tremont had Tremont not made these representations to Counterclaimants." (Amended Counterclaims, ¶ 25). Pinnacle also pleaded that "these representations [in ¶ 26], ... by Tremont were false and Tremont knew they were false at the time that the representations were made to Counterclaimants." (Amended Counterclaims, ¶ 27 [emphasis added]). In addition, "Counterclaimants' reliance on said representations by Tremont was reasonable under the circumstances and was of such a kind and nature as to have been the type of reliance which was reasonably contemplated by Tremont." (Amended Counterclaims, ¶ 30).

Taken together, all of these facts, pleaded by Pinnacle, constitute the "what" element of the heightened pleading requirements of Rule 9(b).

## D.    Pinnacle pleaded, with particularity, that Tremont's officers and directors made the fraudulent statements while one of its agents was in Arizona, and the other agents were in Massachusetts.

Tremont alleges that it is unable to assess whether the deceptive conduct or statements, that Pinnacle complains of, primarily and substantially occurred in Massachusetts, within the meaning of M.G.L. c. 93A, § 11, or in Arizona, within the meaning of A.R.S. § 44-152. It thus alleges that it does not know where the alleged conduct occurred. Tremont is being disingenuous with the Court. *At the very least,*

---

[2] Under Massachusetts law, in order to establish a claim for fraudulent misrepresentation, it is incumbent upon a plaintiff to prove:

> ... that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his detriment.

Elias Bros. Restaurants v. Acorn Enters., 831 F. Supp. 920, 922 (D. Mass. 1993), quoting Danca v. Taunton Savings Bank, 385 Mass. 1, 8 (1982) (*citations omitted*); see also, Turner v. Johnson & Johnson, 809 F.2d 90, 95 (1st Cir. 1986). This standard has further been defined as requiring that the plaintiff's reliance upon the alleged misrepresentation be reasonable. See Elias Bros.,

Tremont is *on notice* that some of the deceptive conduct occurred in Massachusetts, as Tremont has previously argued that jurisdiction in Massachusetts was proper because most of the events took place primarily and substantially in Massachusetts.[3]  In its Complaint, Tremont also alleges that the negotiations between the parties "took place primarily during telephone calls between [Pinnacle] and representatives of Tremont located in Boston, Massachusetts." (See Complaint, ¶ 10; see also, ¶ 16).  Tremont, however, failed to state in its Complaint that Pinnacle's officers (Lang and Grady) were both, at all relevant times during these telephone calls, located in Scottsdale, Arizona. Tremont cannot now claim that it has no adequate notice of *where* these alleged fraudulent statements were made, as it, itself, has pleaded that its representatives were in Boston, MA when they placed long-distance telephone calls to Pinnacle's representatives in Scottsdale, AZ.

However, Pinnacle *has* alleged that Tremont's representatives uttered deceptive statements in both Massachusetts and Arizona.  For example, Pinnacle alleged that Tremont's Arizona-based agent, Posorske, misrepresented himself while he was in Arizona, and Tremont's Massachusetts-based agents, Mee and Gallitto, misrepresented themselves over the telephone while in Massachusetts.  Pinnacle has never alleged that Mee and Gallitto were anywhere else but in Massachusetts when they made their long distance calls to Lang and Grady in Arizona.  In addition, Pinnacle has always maintained that its contacts with Tremont, through Posorske, occurred primarily and substantially while Posorske was in Arizona.  Tremont, at all times relevant to this matter, has had adequate notice that this has been Pinnacle's position, as was argued in Pinnacle's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2), filed with this Court in October of 2004, and also alleged in the First Amended Counterclaim.  (See,

---

831 F. Supp. at 922; Kennedy v. Josephthal & Company, Inc., 814 F.2d 798, 805 (1 Cir. 1987).
[3] As Tremont alleges in its Complaint, venue in Massachusetts is proper "because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district." (See Complaint, ¶ 8).

e.g., Amended Counterclaims, ¶ 13 ("Prior to entering into this Agreement, Counterclaimants were solicited by Tremont's Arizona representative and agent (Posorske) in Arizona"); ¶ 14 ("At all times in his dealings with Counterclaimants, *Tremont's Arizona representative* (Posorske) represented himself to be a Senior Director with Tremont"); ¶ 17 (Posorske "misrepresented that he was quite capable of handling a project of the magnitude of the one for which Counterclaimants were seeking the 'subject financing'")).

Tremont also alleges that Pinnacle does not identify any dates of when these fraudulent statements were made. Tremont is well aware that the conversations that took place between Pinnacle and Tremont were numerous. However, Tremont has had adequate notice of when these numerous conversations took place. Pinnacle states in its counterclaims that the negotiations began in 2003. As the MBA was executed on or about September 4, 2003, it is only logical to infer that negotiations to enter into the MBA occurred during the month leading up to September, *i.e.*, August of 2003. In addition, the business relationship between Pinnacle and Tremont soured in July of 2004, as alleged by Tremont in its own Complaint. (See Complaint, ¶ 22: "In July, 2004, the Defendants secured financing ... with another lender and ceased all negotiations with Fidelity and Tremont"). Thus, at the very least, Tremont is on notice that its fraudulent misrepresentations were uttered during the one-year time frame of their business relationship with Pinnacle.

In its own Complaint, Tremont is just as particular as to specific points of time of when the communications between Tremont and Pinnacle took place, and when Pinnacle allegedly made its fraudulent statements:

16.    *In 2003 and 2004*, Tremont, Fidelity and the Defendants negotiated the terms....

18.    *In the months leading up to July, 2004*, Tremont, Fidelity and the Defendants engaged in negotiations concerning the terms of a financing agreement.

(Complaint, ¶¶ 16, 18). According to Tremont, it was during these time frames that Pinnacle allegedly made its fraudulent statements. As Pinnacle's fraud counterclaims arise out of the same transaction or occurrence that is the subject matter of Tremont's fraud claims contained in its Complaint, Tremont cannot now argue that it does not have adequate notice of "<u>where</u>" and "<u>when</u>" the deceptive conduct, alleged in Pinnacle's First Amended Counterclaim, occurred.

**E.     <u>Pinnacle's statutory fraud counterclaims are derived from its breach of contract counterclaim.</u>**

Tremont alleges that Pinnacle's statutory fraud counterclaims are fatal because they are based on the fraud claim in Count I of Pinnacle's First Amended Counterclaim. Tremont could not be any more wrong. Pinnacle's statutory claim under M.G.L. c. 93A (Count II) derives from its breach of contract counterclaim, as set forth in Count IV of Pinnacle's First Amended Counterclaim. As Tremont states in its own Motion to Dismiss, "these allegations do nothing more than restate simple, *contract-based* expectations of performance detailed under the MBA...." Under Massachusetts law, M.G.L. c. 93A claims can, and do arise, out of breach of contract claims for deceptive business practices by a business, as is the case here.[4] While Pinnacle maintains that it has pleaded its fraud counterclaims with sufficient particularity so as to give Tremont adequate notice, Pinnacle's c. 93A counterclaim must nevertheless survive as it is derived from its breach of contract counterclaim against Tremont.

On the other hand, Count I of Pinnacle's First Amended Counterclaim is a common law fraud claim that is based on Pinnacle's breach of a contract counterclaim. As set forth above, Pinnacle has pleaded its common law fraud counterclaims with sufficient particularity so as to give Tremont adequate notice of the fraud counterclaims

---

[4] In fact, under Massachusetts law, a party can be found to <u>not</u> have been in breach of contract, and can still be found to have committed unfair and deceptive business practices violative of c. 93A.

brought against it.  For the same reason, Pinnacle's Arizona statutory fraud claim survives Rule 9(b) scrutiny.

## CONCLUSION

Pinnacle has pleaded its fraud counterclaims with sufficient particularity so as to survive Fed. R. Civ. P. 9(b) scrutiny.

The "**who**" has been identified in Pinnacle's First Amended Counterclaim as "Tremont," acting through its agents, "Mee, Gallitto, and Posorske."  In addition, Posorske is specifically identified as having made certain misrepresentations.

The "**what**" has been identified in Pinnacle's First Amended Counterclaim as the following statements: (i) the fact that Tremont did not (and never intended) to allocate its work product in such a fashion as to cause Gallitto to be the lead person on this Project, but instead Tremont assigned Posorske as the lead person; (ii) Tremont misrepresented the skill, knowledge, experience and background level and abilities of Posorske relative to Posorske's ability to obtain the "subject financing;" and (iii) Tremont knew that it could not obtain financing in accordance with the terms and conditions of the "subject financing."  Pinnacle also pleaded that "at the time that Tremont made these various representations to Counterclaimants, Tremont knew that said representations were false ... ."

The "**where**" has been identified in Pinnacle's First Amended Counterclaim as both, in Massachusetts *and* Arizona.  Tremont has had adequate notice that all relevant communications took place in either Tremont's Boston offices or in Pinnacle's Scottsdale offices.

The "**when**" has been identified as occurring between July or August of 2003, to July of 2004, during the one-year period of their business relationship.  This one-year time frame is sufficient to give Tremont adequate notice, as Pinnacle's fraud counterclaims arise out of the same transaction or occurrence that is the subject

matter of Tremont's fraud claims contained in its Complaint.  Thus, Tremont's Motion

to Dismiss must be denied, as Pinnacle has met the "who, what, where, and when"

requirements of Fed. R. Civ. P. 9(b).[5]

   Should this Court find that Pinnacle's fraud counterclaims are not pleaded with

sufficient particularity, Pinnacle hereby moves this Honorable Court for Leave to Amend

the First Amended Counterclaim, pursuant to Fed. R. Civ. P. 15(a).

## II.    MOTION FOR LEAVE TO AMEND
## THE FIRST AMENDED COUNTERCLAIMS

### A.    Pinnacle's motion for leave to amend should be granted, as Tremont would not suffer any undue prejudice.

   Motions for leave to amend "shall be freely given when justice so requires."

Interstate Litho Corp. v. Brown, 255 F.3d 19, 25 (1st Cir. 2001), quoting Fed. R. Civ. P.

15(a); see also Resolution Trust Corp. v. Gold, 30 F.3d 251, 253 (1st Cir. 1994) ("Leave

to amend is to be freely given, unless it would be futile, or reward, *inter alia*, undue or

intended delay").  "And, as the United States Supreme Court has stated, the liberal

amendment policy of Rule 15(a) is a mandate to be heeded."  Espinosa v. Sisters of

Providence Health Sys., 227 F.R.D. 24, 25-26 (D. Mass. 2005), citing Foman v. Davis,

371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962).

   In the instant matter, Tremont will not be unduly prejudiced if this Court allows

Pinnacle's Motion for Leave to Amend.[6]  Pinnacle has not unduly delayed moving for

leave to amend, as it is moving to amend as soon as it became aware of Tremont's

---

[5] "When a claim sounding in fraud contains a hybrid of allegations, some of which satisfy the strictures of Rule 9(b) and some of which do not, an inquiring court *may sustain the claim* on the basis of those specific allegations that are properly pleaded."  Rodi v. S. New Eng. Sch. of Law, 389 F.3d 5, 15-16 (1st Cir. 2004), citing Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1105 (9th Cir. 2003) [emphasis added]; Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 366 (1st Cir. 1994).

[6] On or about March 30, 2005, Pinnacle filed its original Counterclaim.  On or about April 15, 2005, as a matter of right, Pinnacle filed its First Amended Counterclaim to correct some minor grammatical errors and to add the Arizona statutory fraud claim.  See, e.g., Fed. R. Civ. P. 15(a) (a plaintiff is permitted to amend a complaint once as a matter of right prior to the filing of a responsive pleading by the defendant).

allegations of inadequate notice, in the early stages of this litigation.  In fact, discovery has not yet been started, either by Pinnacle or Tremont.  Nor would this amendment cause Tremont to alter its trial tactics or strategy, as Pinnacle's fraud counterclaims arise out of the same transaction or occurrence that is the subject matter of Tremont's Complaint.  See, e.g., Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004) ("[p]articularly disfavored are motions to amend whose timing prejudices the opposing party by 'requiring a re-opening of discovery with additional costs, a significant postponement of the trial, and a likely major alteration in trial tactics and strategy...'").  In addition, this Court has not set a scheduling order that governs the time for amendments.  See id., citing O'Connell v. Hyatt Hotels of P.R., 357 F.3d 152, 154-155 (1st Cir. 2004) ("[o]nce a scheduling order is in place, the liberal default rule is replaced by the more demanding 'good cause' standard of Fed. R. Civ. P. 16(b)").

As set forth above, Pinnacle maintains that it has met the "who, what, where, and when" requirements of Rule 9(b).  However, if this Court deems those fraud counterclaims have not been pleaded with sufficient particularity, Pinnacle moves this Court for leave to amend its First Amended Counterclaims, and hereby submits the proposed Second Amended Counterclaim, attached hereto as Exhibit A.

### III.     CROSS-MOTION TO DISMISS COUNTS IV AND IV (sic) OF TREMONT REALTY CAPITAL, INC.'S COMPLAINT

A.     *In the alternative, Pinnacle cross-moves to dismiss Tremont's common law and statutory fraud claims for the same reasons and law as cited by Tremont in its Motion to Dismiss.*

In the alternative, if this Court finds that Pinnacle did not plead its common law and statutory fraud claims with sufficient particularity so as to survive the heightened standard set forth in Fed. R. Civ. P. 9(b), then, *in the interest of justice and to conserve judicial resources*, Pinnacle hereby adopts, and incorporates by reference, all of the reasons and law cited in Tremont's Memorandum of Law in Support of Its Motion to

Dismiss Counts I, II, III, and VI of the First Amended Counterclaim. See, e.g., Fed. R.

Civ. P. 10(c) ("statements in a pleading may be adopted by reference in a different part

of the same pleading or in another pleading or in any motion …"). Pinnacle hereby

cross-moves to dismiss Count IV (Fraud) and Count IV (sic) (Unfair and Deceptive Acts

and Practices under M.G.L. c. 93A) of Tremont's Complaint for failure to plead these

fraud claims with sufficient particularity.

A review of Tremont's Complaint shows that its fraud claims are pleaded with

the same, or even less, particularity as Pinnacle's fraud counterclaims. For example,

Tremont identifies the parties **who** made the alleged misrepresentations with even less

particularity:

> 21. During the negotiations …, *the Defendants* represented to Tremont
> and Fidelity that they were not engaged in discussions with any potential
> financing source…. At the time *Defendants* made this representation, ….

> 37. The *Defendants'* misrepresentations that they were not in
> discussions with potential financing sources other than Fidelity …

(Complaint, ¶¶ 21, 37 [emphasis added]). The term "the Defendants" does not meet the

"who" particularity requirement of Fed. R. Civ. P. 9(b), and thus Tremont did not plead,

with particularity, the parties "**who**" made the fraudulent statements alleged in its

Complaint.[7]

Tremont identifies the "**what**" as follows:

> 21. …, the Defendants represented to Tremont and Fidelity that they
> were not engaged in discussions with any potential financing source…. At
> the time Defendants made this representation, upon information and

---

[7] In contrast, Pinnacle, in its First Amended Counterclaims, identifies the "who" as:

> [a]t all times material hereto … *Tremont acted through* its authorized directors,
> officers, members, partners, representatives and agents including, but not limited to,
> Daniel O. Mee ('Mee'), Richard C. Gallitto ('Gallitto'), and Russell Posorske ('Posorske').

(Amended Counterclaims, ¶ 7). In addition, Pinnacle particularly identifies Tremont's Arizona
agent as specifically having made certain misrepresentations. Pinnacle alleges that Posorske:

> *misrepresented* that he was quite capable of handling a project of the magnitude of
> the one for which Counterclaimants were seeking the 'subject financing.'

(Amended Counterclaims, ¶ 17 [emphasis added]).

> belief, they were engaged in discussions with potential lending sources....
>
> 37.    The  Defendants'  misrepresentations  that  they  were  not  in
> discussions  with  potential  financing  sources  other  than  Fidelity  ...
> constitute false statements of fact and were known to the Defendants to
> be false when they were made....

Without delving too deeply into the merits of the case, Tremont cannot prove how its

reliance on Pinnacle's alleged misrepresentation(s) was reasonable in light of the terms

of the MBA.[8]  The MBA is devoid of any term or condition that required Pinnacle to

inform Tremont that it was negotiating with any other potential lenders not delineated

in Appendix 1 of the MBA.   Thus, if Pinnacle was not required to inform Tremont of its

outside negotiations, Tremont should have reasonably presumed that Pinnacle could

always be in negotiations with outside sources, and that Pinnacle could always make a

deal with another source excluded from the list in Appendix 1, notwithstanding

Pinnacle's alleged representation that it was not.  (See MBA, ¶ 5, attached to Tremont's

Complaint).  Thus, Tremont cannot show that its reliance on this alleged

misrepresentation (that Pinnacle was not in discussions with potential financing

sources other than Fidelity) was reasonable, and therefore, Tremont cannot maintain a

claim for fraudulent misrepresentation against Pinnacle.

Additionally, in its Complaint, Tremont alleges that the negotiations between the

parties "took place primarily during telephone calls between [Pinnacle] and

representatives of Tremont located in Boston, Massachusetts." (See Complaint, ¶ 10;

see also, ¶ 16).  Tremont states that its representatives were in Boston, MA, but it does

not state **where** Pinnacle's representatives were when Pinnacle allegedly made these

fraudulent statements.  Tremont is also just as particular as to specific points of time

of **when** the communications between Tremont and Pinnacle took place, and when the

---

[8] Under Massachusetts law, in order to establish a claim for fraudulent misrepresentation, it is
incumbent upon a plaintiff to prove that its reliance on this material fact was reasonable in light
of the circumstances.  See Elias Bros. Restaurants, 831 F. Supp. at 922; Kennedy, 814 F.2d at
805.

alleged fraudulent statements by Pinnacle were made:

> 16.   *In 2003 and 2004*, Tremont, Fidelity and the Defendants negotiated the terms....

> 18.   *In the months leading up to July, 2004*, Tremont, Fidelity and the Defendants engaged in negotiations concerning the terms of a financing agreement.

(Complaint, ¶¶ 16, 18).  According to Tremont, it was during these time frames that Pinnacle allegedly made its fraudulent statements.  At no time does Tremont ever get more specific than that in its Complaint.  Tremont must be held to the same standard of particularity as Pinnacle.

Significantly, Count IV (*sic*) of Tremont's Complaint, for Unfair and Deceptive Acts and Practices under M.G.L. c. 93A, is nearly identical to Count II of Pinnacle's Amended Counterclaims.  If this Court finds that Pinnacle's M.G.L. c. 93A claim is based on its fraud claim, and not on its breach of contract claim, then it must similarly find that Tremont's M.G.L. c. 93A claim (Count IV (*sic*)) is based on its fraud claim (Count IV).  If Pinnacle's c. 93A claim fails, then Tremont's c. 93A claim must also fail for the same reason.

## CONCLUSION

*In the alternative*, should this Court find that Pinnacle's fraud counterclaims are not pleaded with sufficient particularity, Pinnacle hereby adopts, and incorporates by reference, all of Tremont's reasons and law cited in its Motion to Dismiss, and in the interest of justice and judicial economy, Pinnacle cross-moves to dismiss Count IV (Fraud) and Count IV (*sic*) (Unfair and Deceptive Acts and Practices under M.G.L. c. 93A) of Tremont's Complaint.  These two fraud counts are <u>not</u> pleaded with sufficient particularity so as to survive Fed. R. Civ. P. 9(b) scrutiny.  Therefore, Tremont's fraud claims must be dismissed.

WHEREFORE, the defendants and counterclaimants, Pinnacle Group, LLC,

Adams Canyon Ranch, LLC, John Lang, and Michael Grady, hereby request that this

Honorable Court deny Tremont Realty Capital, Inc.'s Motion to Dismiss Counts I, II, III,

and VI of the Amended Counterclaim; allow the defendants' and counterclaimants'

Motion for Leave to Amend the First Amended Counterclaim; or in the alternative, that

this Court dismiss Counts IV and Count IV (*sic*) of the plaintiff's Complaint for failure to

plead these two fraud claims with particularity.

### IV.    REQUEST FOR HEARING

The defendants and counterclaimants, Pinnacle Group, LLC, Adams Canyon

Ranch, LLC, John Lang, and Michael Grady, respectfully request a hearing on plaintiff

Tremont Realty Capital, Inc.'s Motion to Dismiss Counts I, II, III, and VI of the Amended

Counterclaim, and the defendants' and counterclaimants' Opposition thereto; Motion

for Leave to Amend; and Cross-motion to Dismiss.


Respectfully Submitted,

/s/ *William J. Hunt*
_____
William J. Hunt (BBO #244720)
Armando J. Acosta (BBO #648242)
**Clark Hunt & Embry**
55 Cambridge Parkway
Cambridge, MA 02142
(617) 494-1920

Dated:  June 24, 2005

### CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of June, 2005, a courtesy copy of the above
document was served, by first class mail, upon plaintiff's attorneys, James M.
Wodarski, Esq., and Michael S. Day, Esq., Mintz, Levin, Cohn, Ferris, Glovsky & Popeo,
P.C., 1 Financial Center, Boston, MA  02111:

/s/ *Armando J. Acosta*
_____

**EXHIBIT A**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TREMONT REALTY CAPITAL, INC., a Massachusetts Corporation, Plaintiff, <br><br> v. <br><br> PINNACLE GROUP, LLC, an Arizona limited liability company; ADAMS CANYON RANCH, LLC, an Arizona limited liability company, John Lang, an individual; and Michael Grady, an individual, Defendants, and <br><br> ─────────────────────── <br><br> PINNACLE GROUP, LLC, an Arizona limited liability company; ADAMS CANYON RANCH, LLC, an Arizona limited liability company, John Lang, an individual; and Michael Grady, an individual, Counterclaimants, <br><br> v. <br><br> TREMONT REALTY CAPITAL, INC., a Massachusetts Corporation, Counter-Defendant. | **Case No. 04-11853-RGS** <br><br><br> **SECOND AMENDED ANSWER AND SECOND AMENDED COUNTERCLAIMS** |

Defendants Pinnacle Group, LLC ("Pinnacle"), Adams Canyon Ranch, LLC ("Adams Canyon"), John Lang ("Lang"), and Michael Grady ("Grady") (Pinnacle, Adams Canyon, Lang and Grady all hereafter collectively referred to as "Defendants" or "Counterclaimants") deny all of the allegations set forth in all of the rhetorical paragraphs of Plaintiff's Complaint which are not specifically admitted by the Defendants herein.  Defendants hereby answer, counterclaim, and otherwise respond to Plaintiff's Complaint in this matter as follows:[1]

---

[1] Paragraphs numbered 1-45 of the Answer relate to the correspondingly numbered paragraphs in Plaintiff's Complaint.

## AMENDED ANSWER

1.    As to rhetorical paragraph 1 of Plaintiff's Complaint, Defendants admit that the action which has been brought has been characterized by Plaintiff as one for breach, unjust enrichment, fraud, and unfair and deceptive practices, and that Plaintiff's action is alleged to be based upon an agreement entered into by Defendants and Plaintiff; however, Defendants deny the remaining allegations of rhetorical paragraph 1 of Plaintiff's Complaint.  Specifically, Defendants deny they were obligated to pay a brokerage fee to Plaintiff in the sum of $830,000.00 (or any other amount) in the event the Defendants "obtained financing from any source." Defendants affirmatively allege that the brokerage fee was only due to Plaintiff, if at all, in the event that Plaintiff or Defendants obtained financing for the project in a specific amount and upon specific terms, which Defendants were seeking for this specific real estate project (the "subject financing").  As of this date, Defendants have yet to obtain such subject financing.

2.    Admitted.

3.    Admitted.

4.    Admitted.

5.    Admitted.

6.    Admitted.

7.    Defendants deny that this Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because, based upon the compulsory Counterclaims which Defendants have set forth herein below, and in Defendants' Third-Party Complaint, a proper realignment of the parties in order to determine each party's substantial interests in this matter evidences that complete diversity of jurisdiction as required by 28 U.S.C. §1332 does not exist.  In addition, Defendants affirmatively

- 2 -

deny that the amount in controversy, to the extent that Plaintiff is entitled to any damages at all, exceeds $75,000.00 and, according to 28 U.S.C. §1332(b), the costs of this action should be imposed upon Plaintiff by the Court.

8.    Defendants deny that venue in this Court is proper pursuant to 28 U.S.C. §1391(a) or otherwise for the reasons set forth in Defendants' Motion to Dismiss previously filed with this Court, all of the reasons set forth in said Motion to Dismiss hereby specifically incorporated by reference into this Answer as affirmative allegations as to the impropriety of venue in this District. Defendants affirmatively deny that a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District of Massachusetts.

9.    Defendants admit that Tremont and the Defendants entered into a Mortgage Banking Agreement ("Agreement"). Defendants admit that said Agreement bears the type-written date of August 30, 2003, in the first paragraph thereof. Defendants are without sufficient information to form a belief as to the truth or untruth of the exact time in which the parties actually "entered" into said Agreement and accordingly, the allegation that the Agreement was entered into "on August 30, 2003" is hereby denied. Defendants admit that a part of the Agreement was annexed to Plaintiff's Complaint as Exhibit A. Defendants affirmatively deny that said Exhibit A constitutes all of said Agreement.

10.    Defendants admit that they negotiated the terms of the Agreement over a period of several months prior to entering into the Agreement. Defendants deny that the negotiations took place primarily during telephone calls between the Defendants and representatives of Tremont located in Boston, Massachusetts. Defendants deny the remaining allegations of rhetorical paragraph 10 of Plaintiff's Complaint. Defendants affirmatively allege that the negotiations primarily took place between

- 3 -

Plaintiff's principal (Russell Posorske) who was (and still is) a resident of the State of Arizona and Defendants at Defendants' offices in Arizona. In addition, Defendants allege that the communications, to the extent that they did involve representatives of Tremont via telephone who were located in Boston, Massachusetts, also involved, in almost every instance in those same phone calls, a representative of Tremont located in Phoenix, Arizona (*i.e.*, Russell Posorske).

11.    Defendants admit that the Agreement upon which Plaintiff has brought its lawsuit contains the quoted phrase however, Defendants deny the allegation of rhetorical paragraph 11 of Plaintiff's Complaint. Defendants allege that the Agreement speaks for itself and that the phrase "subject financing" as used in the Agreement had a specifically defined meaning to the parties.

12.    Defendants admit that the Agreement contains the language as alleged in rhetorical paragraph 12 of Plaintiff's Complaint; however Defendants deny that that said language, or any other language in the Agreement, entitles Plaintiff to the commission which Plaintiff is seeking in this litigation. Defendants allege that the Agreement speaks for itself. Defendants further allege that the Agreement, and specific terms set forth in said Agreement, must be placed, construed and interpreted in context. And further, Defendants affirmatively allege that the Agreement and the obligation to pay the fee relative thereto, was expressly conditioned upon Plaintiff's obtaining for Defendants the "subject financing." As of this date, the Defendants have never received the "subject financing" from any source whatsoever and no commission is accordingly due to Plaintiff.

13.    Defendants admit that Tremont's right to procure or arrange financing to the project was subject to the exception that if the Defendants obtained the subject financing from a source listed on Appendix 1 to the Agreement, Tremont would not be

- 4 -

entitled to payment of the brokerage commission in question but would only be
entitled to payment of a break-up fee of $25,000.00. Defendants allege that the
Agreement speaks for itself. Defendants further allege, however, that Tremont's
exclusive right to procure the subject financing for the Project was also subject to the
exception that Tremont would not be entitled to the commission unless it performed
pursuant to the Agreement by providing Defendants with the "subject financing."
Defendants have not yet received said "subject financing," and accordingly Tremont's
failure to perform bars them from the right to recover either the commission amount
or the break-up fee of $25,000.00 as set forth in the Agreement.

14.    Defendants admit that the sources listed in Appendix 1 to the Agreement
are denominated as Funding America, Sion Holdings, and Old Standard Life.
Defendants further allege that the Agreement and the exhibits thereto speak for
themselves.

15.    Defendants admit that Tremont introduced the Project (as defined in
paragraph eleven (11) of Plaintiff's Complaint) to Fidelity Management and Research
Company ("Fidelity") as a potential funding source for the Project. Defendants deny
that Fidelity at any time committed to provide the required subject financing for the
Project. Moreover, Defendants affirmatively allege that Fidelity subsequently
demanded additional conditions, including the requirement that Defendants acquire
an additional 600 acre parcel of real estate not originally contemplated by the parties
before Fidelity would provide the funding for the Project to Defendants. Accordingly,
neither Fidelity (nor any other lending source) has ever provided, or has been
prepared to provide, the "subject financing" to the Defendants and, accordingly, no
commission has been earned or is otherwise due to Plaintiff relative to this matter.

16.    Defendants are without sufficient information to form a belief as to the

- 5 -

truth or untruth of the allegations set forth in rhetorical paragraph 16 of Plaintiff's Complaint at this time and said allegations are accordingly denied.

17.    Defendants admit that the dealings with Fidelity ultimately got to a point where Fidelity was apparently committed to provide certain financing to the Project subject to the execution of "an appropriate financing agreement and related documentation" as alleged by Plaintiff; however, Defendants deny the allegation of rhetorical paragraph 17 of Plaintiff's Complaint.  Defendants further allege that the proposed "appropriate financing agreement and related documentation" involved Defendants' obligation to acquire an additional parcel of property adjacent to the Project comprising approximately 600 additional acres, as well as imposing upon Defendants certain other terms and conditions that were materially different from the "subject financing" which Defendants had always been seeking relative to the Project. Defendants affirmatively allege that neither Fidelity nor any other funding source has ever committed to provide Defendants with the "subject financing" that Defendants have been seeking relative to the Project and upon which the exclusivity provision of the Agreement was based.

18.    Defendants deny that Defendants had retained counsel to assist in negotiating and documenting the terms of a final financial agreement.  Defendants are without sufficient information to form a belief as to the truth or untruth of the remaining allegations set forth in rhetorical paragraph 18 of Plaintiff's Complaint at this time and said allegations are accordingly denied.

19.    Denied.

20.    Admitted.

21.    Defendants admit that at the time they executed the Agreement with Tremont, that Defendants were not engaged in discussions with any potential

financing sources other than those lenders named in Appendix 1 to the Agreement.
At the time that the negotiations commenced between Defendants and Fidelity,
Defendants were constantly speaking to brokers and other representatives of potential
funding sources in an effort to obtain the "subject financing" for the Project.

22.     Defendants admit that they ultimately secured a form of financing for
the Project from another lender and ceased all subsequent dealings with Fidelity and
Tremont; however, Defendants deny the allegation of paragraph 22 of Plaintiff's
Complaint.  Defendants allege that they have, as of this date, still never secured the
"subject financing" for the Project which Defendants have always sought and upon
which the Agreement with Tremont was predicated.

23.     Defendants admit that they received a copy of the correspondence dated
July 26, 2004 from Tremont as set forth as Exhibit C to the Complaint.  Defendants
deny any characterization of said Exhibit C which Plaintiff has made and affirmatively
allege that Exhibit C speaks for itself.

24.     Defendants admit that Exhibit D to the Complaint is a true and accurate
copy of certain correspondence dated July 27, 2004.  Defendants allege that said
Exhibit D speaks for itself.  Defendants admit that they have rejected Tremont's
demand for payment of a brokerage fee relative to financing for the Project and
affirmatively allege that Tremont has yet to perform pursuant to the terms of the
Agreement and arrange for the "subject financing" for the Project and accordingly
Tremont is not entitled to any brokerage fee relative to the Project.

25.     Defendants incorporate by reference all of their responses to the
allegations set forth in rhetorical paragraphs 1 through 24 of Plaintiff's Complaint
herein above as if fully set forth verbatim in this paragraph 25.

26.     Denied.

27.     Denied.  Moreover, Defendants affirmatively allege that Tremont has failed to perform the conditions precedent to its right to collect any brokerage fee or commission relative to this matter.  In particular, Tremont has failed to provide or arrange for other lending sources to provide the "subject financing" for the Project.

28.     Denied.

29.     Defendants incorporate by reference all of their responses as set forth above to rhetorical paragraphs 1 through 28 of Plaintiff's Complaint as if set forth verbatim in this paragraph 29.

30.     Admitted.

31.     Denied.

32.     Denied.

33.     Defendants incorporate by reference all of their previous responses to rhetorical paragraphs 1 through 32 of Plaintiff's Complaint as if set forth verbatim in this paragraph 33.

34.     Denied.

35.     Denied.

36.     Defendants incorporate by this reference all of their responses to rhetorical paragraphs 1 through 35 of Plaintiff's Complaint as if set forth verbatim in this paragraph 36.

37.     Denied.

38.     Denied.

39.     Denied.

40.     Defendants incorporate by reference all of their responses to the allegations set forth in rhetorical paragraphs 1 through 39 of Plaintiff's Complaint as if set forth verbatim in this paragraph 40.

41.     Defendants deny that they are engaged in trade or commerce within the meaning of Mass. Gen. Laws c. 93A, § 1. Defendants affirmatively allege that they are not subject to jurisdiction within the courts of Massachusetts and that the Massachusetts statutes are not applicable to Defendants in this matter. Moreover, to the extent that the allegations in this rhetorical paragraph of Plaintiff's Complaint can be construed or interpreted to imply that Defendants have violated the provisions of any laws of the Commonwealth of Massachusetts, or otherwise, said allegations are specifically denied. Defendants have never availed themselves of the privilege of doing business in Massachusetts.

42.     Denied.

43.     Denied.

44.     Denied. Moreover, Defendants assert that they have committed no unfair or deceptive acts at any time.

45.     Denied.

## AFFIRMATIVE DEFENSES

a.     Failure to state a claim upon which relief may be granted;

b.     Failure of consideration;

c.     Failure of conditions precedent;

d.     Failure of conditions subsequent;

e.     Fraud;

f.     Illegality;

g.     Laches;

h.     Statute of frauds;

i.     Lack of jurisdiction over the person of all of the Defendants;

j.     Improper venue of this action;

k.     *Forum Non-Conveniens*;

l.     Contributory negligence;

m.     Assumption of the risk;

n.     Comparative fault;

o.     Failure to do equity;

p.     Unclean hands;

q.     Any other matter constituting an avoidance or affirmative defense which Defendants may subsequently discover; and

r.     *Estoppel* (promissory and equitable).

WHEREFORE, by reason of the foregoing, Defendants request that Plaintiff take nothing by way of its Complaint, and that Defendants be awarded their reasonable costs and attorney's fees incurred in the defense of this matter, and for all other relief which the Court or other trier of fact deems just and appropriate under the circumstances.

## SECOND AMENDED COUNTERCLAIMS

Counterclaimants hereby allege the following counterclaims against Plaintiff Tremont:

### (Allegations Common to all Counts)

1.     Tremont is a Delaware Corporation with its principle place of business located at 800 Boylston Street, Suite 401, Boston, Massachusetts.

2.     Tremont also maintains (and has maintained at all times material hereto) a corporate office in the State of Arizona, specifically at 7526 E. Camelback Road, Scottsdale, Arizona 85251.

3.     Counterclaimant Pinnacle is an Arizona limited liability company with its principle place of business located at 8145 N. 86th Street, Scottsdale, Arizona.

4.     Counterclaimant Adams Canyon is an Arizona limited liability company with its principle place of business located at 8145 N. 86th Street, Scottsdale, Arizona.

5.     Counterclaimant Lang is an individual residing in Scottsdale, Arizona. Lang is President, CEO, and one of two co-managers of Pinnacle.

6.     Counterclaimant Grady is an individual residing in Paradise Valley, Arizona.  Grady is the CFO and the other Co-Manager of Pinnacle, as well as being the Manager of Santa Paula Development Partners, LLC, which is the Manager of Adams Canyon.

7.     At all times material hereto Counter-Defendant Tremont acted through its authorized directors, officers, members, partners, representatives and agents including, but not limited to, Daniel O. Mee ("Mee"), Richard C. Gallitto ("Gallitto"), and Russell Posorske ("Posorske").

8.     Upon information and belief, Mee is, and was at all times material hereto, a director, officer, employee, and/or authorized representative and agent of Tremont and Tremont held Mee out as an "Executive Director" of Tremont to members of the general public, including Defendants/Counterclaimants herein.

9.     Upon information and belief, Posorske is, and was at all times material hereto, a director, officer, employee, and/or authorized representative and agent of Tremont and Tremont held Posorske out as a "Senior Director" of Tremont to members of the general public, including Defendants/Counterclaimants herein.

10.     Upon information and belief, Gallitto is, and was at all times material hereto, a director, officer, employee, and/or authorized representative and agent of Tremont and Tremont held Gallitto out as an "Executive Director" of Tremont to members of the general public, including Defendants/Counterclaimants herein.

11.    At all times material hereto, the statements of Mee, Gallitto, and Posorske, and other actions and conduct of Mee, Gallitto and Posorske, were made or undertaken for each of their own respective personal benefits and interests, as well as for the personal benefit and interest of Tremont.

12.    In the year 2003 Tremont, through its agents Posorske, Mee, Gallitto, and/or others, entered into negotiations with Counterclaimants relative to the terms of a certain Mortgage Banking Agreement.  A portion of said Mortgage Banking Agreement ("Agreement") is annexed as Exhibit A to the Complaint which Tremont has filed in this cause.

13.    Prior to entering into this Agreement, Counterclaimants were solicited by Tremont's Arizona representative and agent (Posorske) in Arizona.

14.    At all times in his dealings with Counterclaimants, Tremont's Arizona representative (Posorske) represented himself to be a Senior Director with Tremont. In addition, Tremont lists Posorske on its international website as a "Senior Director" with Tremont.

15.    Prior to entering into negotiations with Counterclaimants, Tremont had formed a joint venture with Posorske and other persons known as "Tremont-Fortis Realty Capital, LLC" ("Tremont-Fortis").

16.    Posorske represented to Counterclaimants that he was (or had been) a principal in an entity known as Fortis Advisors, LLC ("Fortis"), and had been involved in the financing of various real estate ventures in previous years that included Posorske's participation in securing hundreds of millions of dollars of investment money for real estate portfolios from "Wall Street."  Indeed, according to Posorske, he, as a member of Fortis, obtained $450,000,000.00 in funds from Shearson Lehman Brothers' clients' investment monies in previous years and had invested those monies

into real estate ventures involving Posorske himself.

17.    At all times relevant to the allegations set forth herein, Posorske continued to hold himself out to the Counterclaimants as a representative or agent of Fortis.

18.    Posorske held himself out to be extremely knowledgeable, experienced, well-connected with various sources of real estate capital, and misrepresented that he was quite capable of handling a project of the magnitude of the one for which Counterclaimants were seeking the "subject financing" known as the Ranch at Santa Paula (the "Project") and in arranging for funding real estate projects having the parameters of the "subject financing."

19.    Defendant Tremont, acting through Posorske, Gallitto, Mee and others, also held itself out as being extremely knowledgeable, experienced, well-connected relative to potential real estate capital funding sources, and quite capable of handling a real estate project of the magnitude of the Project.

20.    At all times Tremont represented to Counterclaimants that its Arizona based representative (Posorske) possessed the expertise, background and authority to not only negotiate on behalf of Tremont relative to the Mortgage Banking Agreement entered into by the parties, but also that Posorske, being a Senior Director with Tremont, had an extensive amount of experience, background, skill, expertise and knowledge with regard to: (1) obtaining financing for real estate projects of the character, quality, and magnitude of the project; and (2) obtaining the correspondingly requested "subject financing."

21.    Tremont also represented that it, as well as its agents and representatives (Posorske, Tremont-Fortis, Mee, Gallitto and others) had an extensive amount of expertise, background, skill, experience, and knowledge in obtaining

financing for real estate projects of a character, quality and magnitude of the "subject financing" (as defined below) involved in the Project.

## COUNT I
### (Fraud)

22.     Counterclaimants hereby incorporate by reference all of the allegations set forth in rhetorical paragraphs 1 - 21 of this Counterclaim as if set forth verbatim herein.

23.     In the course of the negotiations leading up to the execution of the Agreement upon which Tremont's Complaint in this matter is allegedly based, the parties discussed the financing for the Project which Counterclaimants sought to obtain, which financing consisted of a specified amount, specific terms, and was designed for a specific purpose.  Counterclaimant Pinnacle Group, through its agents Grady and Lang, specifically advised Tremont's agents (Posorske, Mee, and Gallitto) on more than one occasion in July and August, 2003, the specific amount, terms, and purpose for the subject financing.  The amount, terms, and purpose of the financing for the Project told to Mee, Gallitto  and Posorske was as follows:

    a.    The amount of the loan was to be $16,500,000.00;

    b.    The loan was to be an "entitlement loan" which, under the circumstances of this matter, meant it was to be used for the purpose of enabling the Counterclaimants to modify the zoning on the property comprising the Project to allow for the construction of one home per ten (10) acres, and the development of a golf course, golf course clubhouse, and an equestrian center on the real estate;

    c.    The term of the loan was to be for a minimum of four (4) years;

    d.    The interest rate on the loan was to be in the approximate range of 10 to 12 percent (10%-12%) per annum;

- 14 -

e.    The loan was to allow for a return to Counterclaimants upon closing (placing) of the loan of 100% of Counterclaimants' previously invested equity relative to the Project (i.e., a return of approximately $4.4 million dollars back to Counterclaimants);

f.    The loan was to be non-recourse as to Counterclaimants (*i.e.*, was to be secured by the real estate and the Project itself) meaning the approximate 4100 acres which comprised the Project at that time; and

g.    There was to be no requirement for any additional investment of monies by Counterclaimants on a "go forward" basis during the four (4) year loan period, meaning, among other things, that the $45,000.00 per month Counterclaimants had to pay Dahlberg Farms, Inc. each month would be paid from the proceeds of the loan each month going forward during said four (4) year term.

24.    The loan terms and provisions set forth in paragraph 22(a) through 22(g) above are what are referred to in this pleading as the "subject financing" and indeed constitute what Counterclaimants, and Tremont, Mee, Gallitto, Posorske, Tremont-Fortis, Fortis-Advisors, and all other employees and representatives of Tremont who were involved in the negotiation of the Agreement, understood the "subject financing" to be referring to when used in the Agreement and otherwise.

25.    Sometime in late July, or the first day or two in August, 2003, Grady received a telephone call from Posorske desiring to meet with Grady to talk about the Project.  Two days later, sometime during the first week of August 2003, Posorske had his first face-to-face meeting with Counterclaimants concerning the project.  Present in attendance at this meeting were Posorske, Grady, Lang, and Boyd.  The meeting was held at Pinnacle's office at 8145 N. 86th Place, Scottsdale, Arizona.

- 15 -

26.    In this first face-to-face meeting, Posorske, who represented himself to Counterclaimants as having had significant previous "Wall Street experience" as far as obtaining funding for real estate loans is concerned, discussed all of the details of the project with Counterclaimants.  Grady, Lang and Boyd advised Posorske about the various details of the project, the plans for the overall development of the project, and specifically shared with Posorske Pinnacle's financing needs (i.e., Pinnacle's representatives Grady, Lang and Boyd supplied to Posorske all of the details concerning the "subject financing").

27.    Two days later, still during the first seven to ten days in the month of August, 2003, Posorske contacted Grady and again established another face-to-face meeting which was held at Pinnacle's office at 8145 N. 86th Place.  Present in this meeting were Lang, Grady, and Posorske.  In this meeting, Posorske, who also represented that he was acting as an agent of Fortis, advised that Posorske was "affiliated with Tremont" as a "Senior Director" and that he had reviewed the details of the "subject financing" with certain principals of Tremont and that those principals and Tremont "wanted to do the deal."

28.    In this second face-to-face meeting, Posorske supplied Counterclaimants with a copy of his Tremont business card identifying himself as a "Senior Director" and also directed Counterclaimants to review additional information concerning Tremont's capabilities and background on Tremont's website, which Grady and Lang did immediately after this second face-to-face meeting with Posorske.

29.    In this same second face-to-face meeting with Posorske, Grady specifically asked Posorske the following:  "Based on your knowledge of working with Tremont and being a part of the Tremont team, what can we expect if you guys go out and get financing for us?  What kind of terms are we looking at?"

- 16 -

30.    In direct response to this question, Mr. Posorske stated words to the effect that: "You can get your three to four year loan; you should be looking at an interest rate of between 10% to 12%; you can expect that the loan will be secured by the real estate which comprises the project; we should be able to get 100% of your equity back to you; and there will be no equity participation by the lender."

31.    Mr. Grady understood Posorske to be referring to the $4.5 million dollars which Counterclaimants had previously invested into the project when Posorske stated that he believed Tremont should be able to "get 100% of your equity back to you."

32.    On the strength of those specific representations made by Posorske on behalf of Tremont to Grady on behalf of Pinnacle, Pinnacle and the other Counterclaimants authorized Posorske to proceed in putting together Tremont's "Fee Agreement" (i.e., the Mortgage Banking Agreement upon which Plaintiff's Complaint is based).

33.    In addition, in this second face-to-face meeting, as well as in subsequent telephone conversations over the next several days, Posorske expressly represented to Grady that he (Posorske) and Tremont as a company, were both extremely knowledgeable and experienced in obtaining financing of the magnitude, scope and nature of the "subject financing." In addition, Posorske expressly represented to Grady in this second face-to-face meeting, as well as in subsequent telephone conversations, that he (Posorske) and the Tremont team were knowledgeable and experienced in obtaining financing for projects of the scope and magnitude of the project in particular and that Tremont could (and would) utilize commercially reasonable efforts to secure for the Counterclaimants the "subject financing" (i.e.,

- 17 -

financing for the project which met all of the above terms and parameters as set forth previously."

34.    In this same second face-to-face meeting with Grady and Lang, Posorske indicated that one of Tremont's most senior and experienced individuals (i.e., Gallitto) would be made the "lead" or "point person" who would primarily take the most active role in contacting potential funding sources, negotiating and dealing with said potential funding sources, and finalizing and consummating the ultimate obtainment of the subject financing from one or more funding sources for the benefit of the Counterclaimants and the project.

35.    Approximately three or four days after the second face-to-face meeting during the first week of August, 2003, Mr. Posorske attended another "face-to-face" meeting with Mr. Grady at Pinnacle's office.  Prior to this third face-to-face meeting, Mr. Posorske and Mr. Grady exchanged numerous e-mails concerning various aspects of the project and the finalization of the language that would go into the Mortgage Banking agreement (the commission agreement upon which Plaintiffs have brought this action).

36.    In several phone conversations between Grady and Posorske between the second and the third face-to-face meeting, Posorske continued to reassure Grady and Pinnacle that Tremont felt it could broker the financing which Counterclaimants were seeking (i.e., the subject financing).

37.    At the third face-to-face meeting Posorske, on behalf of Tremont, presented to Grady, on behalf of Pinnacle and Adams Canyon Ranch, the Mortgage Banking Agreement.  At the time the Agreement was presented to Grady, Grady was told (and subsequently saw) that the Agreement contained an exclusivity clause. Grady balked at signing a brokerage agreement with Tremont that in effect gave

Tremont an exclusive listing to find the subject financing for the property. In this third face-to-face meeting Posorske insisted that Tremont had to have the exclusivity clause contained in the Agreement.

38.    When questioned as to why Tremont insisted on having an exclusive agreement, Posorske advised Grady (both in the third face-to-face meeting as well as in a subsequent phone conversation) to the effect that: "We are a large firm. We can't be out there representing this project to our partners if this thing is going to be shot-gunned across the United States. We need to know with some specificity that we are representing this as an exclusive transaction to our clients – that it is not being 'shopped' – because that's the way we work. You have to trust us. Our Resume is big and good and our sources are excellent, so you don't need to go shopping this deal around to everybody anyhow. Just let us do it exclusively."

39.    The above comments were made expressly by Mr. Posorske to Mr. Grady at the third face-to-face meeting held during the first 14 days of August, 2003 at Pinnacle's office at 8145 N. 86th Place, Scottsdale, Arizona.

40.    The Counterclaimants unsuccessfully attempted to negotiate away the exclusivity provision. Finally, there was a fourth face-to-face meeting between Mr. Posorske and Mr. Grady, with no one else present, at Pinnacle's office in Scottsdale, Arizona sometime between August 20th and September 4, 2003. In this face-to-face meeting the necessity of Counterclaimant's executing the Mortgage Banking Agreement containing the exclusivity provision became the primary topic of discussion. In the meeting Posorske utilized Counterclaimants' telephone and called Tremont's offices in Boston and proceeded to get both Rick Gallitto and Dan Mee, who were two directors of Tremont and who were introduced over the telephone to Mr. Grady by Mr. Posorske at this fourth face-to-face meeting.

- 19 -

41.     Mr. Posorske, after getting Mr. Mee and Mr. Gallitto on the speaker phone in Pinnacle's conference room proceeded to share with Mr. Gallitto and Mr. Mee Mr. Grady's concerns and hesitancy in wanting to sign an agreement with Tremont that contained an exclusive provision.

42.     In response to this explanation, Mr. Mee and Mr. Gallitto shared specifically with Mr. Grady the importance of giving a firm like Tremont an exclusive, stating specifically that Tremont was extremely knowledgeable and experienced in obtaining financing of the magnitude, scope and nature of the "subject financing," and that Tremont was knowledgeable and experienced in obtaining financing for projects of the scope and magnitude of the project in particular, and repeatedly indicated how Tremont was going to use all commercially reasonable efforts to secure for the Counterclaimants the "subject financing" and that Tremont believed they could do so in a commercially reasonable time frame and manner.  Gallitto confirmed that he was one of Tremont's most senior and experienced individuals and that he, Gallitto, would be the "lead" or "point person" who would primarily take the most active role in contacting potential funding sources, negotiating and dealing with said potential funding sources, and finalizing and consummating the ultimate obtainment of the subject financing from one or more funding sources for the benefit of the Counterclaimants and the project.

43.     In this fourth face-to-face meeting with Posorske, while Mr. Gallitto and Mr. Mee were on the speaker phone participating in the conversation, Gallitto, Mee, and Posorske – all three speaking on behalf of Tremont – were encouraging Grady and giving reasons supporting why the Counterclaimants had to give Tremont an exclusive agreement.

- 20 -

44.     Ultimately Mr. Grady asked Messrs. Mee and Gallitto over the speaker phone a question in words to the effect that:  "Are you gentlemen representing to me that you can go out into this marketplace and get me this loan that I need - $16.5 million dollars, approximately 3 to 4 year terms, at approximately 10% to 12% interest on a non-recourse basis, and allowing for the return of our approximate $4.5 million dollars in equity back to us with no additional or contingent investment required on our part?"

45.     In response to that question, all three (i.e., Mee, Gallitto and Posorske) responded "yes, we can.  Based on our best efforts and based on our abilities and our Resume, we can get a loan like that for you."

46.     In response to the representations by Tremont, through its representatives Mee, Gallitto and Posorske, in that face-to-face/speaker phone conversations at Pinnacle's office in Scottsdale, Arizona between August 20, 2003 and September 4, 2003 – and based solely on those representations – Counterclaimants executed the Mortgage Banking Agreement with the exclusivity provision included.

47.     As described above, during the negotiations leading up to the execution of the Agreement between the parties, as well as thereafter, Tremont made several representations and misrepresentations to Counterclaimants as follows:

   a.     That Posorske was extremely knowledgeable and experienced in obtaining financing of the magnitude, scope and nature of the "subject financing" and was knowledgeable and experienced in obtaining financing for projects of the scope and magnitude of the Project in particular;

   b.     That Tremont could (and would) utilize commercially reasonable efforts to secure for the Counterclaimants the 'subject financing' (i.e., financing

- 21 -

for the project which met all of the terms and parameters as set forth in

paragraph 22 herein above);

c.    That the subject financing could be obtained by Tremont for

Counterclaimants in a timely fashion and in a commercially reasonable

time frame and manner; and

d.    That one of Tremont's most senior and experienced individuals (*i.e.*,

Gallitto) would be the "lead" or "point person" who would primarily take

the most active role in contacting potential funding sources, negotiating

and dealing with said potential funding sources, and finalizing and

consummating the ultimate obtainment of the subject financing from

one or more funding sources for the benefit of Counterclaimants and the

project.

48.    These representations and misrepresentations made by Tremont were

material in that they were matters of extreme significance and importance to

Counterclaimants, such that Counterclaimants would never have agreed to the

exclusivity provision in the Agreement with Tremont had Tremont not made these

representations to Counterclaimants.

49.    At the time that Tremont made these various representations to

Counterclaimants, Tremont knew that said representations were false, including, but

not limited to, the fact that Tremont did not (and never intended) to allocate its work

product in such a fashion as to cause Gallitto to be the lead person on this Project,

but instead Tremont assigned Posorske the responsibility for being the lead person for

securing the "subject financing." In addition, Tremont knew that it could not obtain

financing for the Project in accordance with the terms and conditions which

comprised the "subject financing." In addition, Tremont misrepresented the skill,

- 22 -

knowledge, experience and background level and abilities of Posorske relative to

Posorske's ability to obtain financing for the Project in general, let alone financing for

the Project which would comport with the "subject financing" which Counterclaimants

were seeking.

50.    These representations, as well as others, by Tremont were false and

Tremont knew they were false at the time that the representations were made to

Counterclaimants.

51.    Counterclaimants relied upon said representations/misrepresentations

in the exact manner in which Tremont had intended, to wit: Counterclaimants

capitulated and agreed to certain "exclusivity" terms being inserted in the Agreement

to the effect that Tremont was given a "exclusive listing" relative to obtaining the

"subject financing."

52.    Although Counterclaimants were not obligated to refrain from seeking

the subject financing from potential funding sources on their own, in spite of the

exclusivity provisions of the Agreement, Counterclaimants nevertheless did not

approach other potential direct lending sources for the subject financing for a period

of time after the execution of the Mortgage Banking Agreement.

53.    Counterclaimants' reliance on said representations by Tremont was

reasonable under the circumstances and was of such a kind and nature as to have

been the type of reliance which was reasonably contemplated by Tremont.

54.    Counterclaimants have incurred damages as a result of Tremont's

misrepresentations in this matter, including, but not limited to, the following:

a.    Counterclaimants were forced to get a "bullet" loan in order to obtain

interim stop-gap financing for the Project which cost Counterclaimants

nine (9) percentage points in fees and commissions;

b.      The stop-gap financing which Counterclaimants were forced to obtain provides for a maturity date that is 36 months subsequent to the date of the Loan; however, said stop-gap financing in practicality has a term of only 18 months based upon the approved cash flow schedule (sources and uses schedule) for the project. This "shortage" in terms of the allocation of the loan proceeds negatively impacts Third-Party Plaintiffs' ability to obtain the entitlements to the property it now seeks, which will necessitate additional fees, costs and interest expenses in the near future;

c.      Counterclaimants are obligated on a "go forward" basis to pay approximately $45,000.00 per month to Dahlburg Farms, Inc. as its pre-agreed management and consulting fees relative to the Project;

d.      Counterclaimants have incurred, and continue to incur, an extensive amount of attorney's fees to negotiate the bullet loan, as well as attorney's fees relative to this litigation;

e.      Counterclaimants have received a return of their original approximate $5 million dollars worth of equity in the Project; however, they are obligated (contrary to the terms of the subject financing they had been seeking) to reinvest these monies back into the Project at the rate of $45,000.00 per month to cover the Dahlburg Farms, Inc.'s payment. These were monthly payments that the subject financing had been designed to cover, and thus Counterclaimants have lost the opportunity cost on said funds since approximately July 2004, and continue to lose the opportunity cost on said funds for each successive month that expires hereafter; and

f.    Counterclaimants have been otherwise damaged as a result of Tremont's intentional fraudulent conduct in this matter.

55.    In addition to its actual damages incurred as a result of Tremont's fraudulent conduct in this matter, Counterclaimants are entitled to an award of punitive damages against Tremont in order to punish Tremont for its intentionally tortious conduct in this matter, as well as to deter others of a like mind from potentially engaging in said intentionally tortious conduct in the future.

WHEREFORE, by reason of the foregoing, Counterclaimants pray for a judgment against Tremont as follows:

A.    In the full amount of Counterclaimants' actual damages incurred as a result of Tremont's intentionally tortious conduct;

B.    In an amount of punitive damages sufficient to punish Tremont for its intentionally tortious conduct as well as to deter others of a similar mind from engaging in such conduct in the future;

C.    For Counterclaimants reasonable costs and attorney's fees incurred in the processing of this Counterclaim; and

D.    For all of the relief which the trier of fact deems Counterclaimants to be entitled.

**COUNT II**
**(Unfair and Deceptive Acts and Practices Pursuant M.G.L. c. 93A)**

56.    Counterclaimants hereby re-allege and incorporate all of the matter set forth in rhetorical paragraphs 1 through 55 set forth above as if set forth verbatim herein.

57.    Tremont is engaged in trade or commerce within the meaning of M.G.L. c. 93A, §1.

58.    The actions of Tremont were calculated to obtain the benefits provided by the Counterclaimants under the Agreement (including, but not limited to, providing Tremont with an exclusive listing, agreeing to a $25,000.00 break-up fee, a mortgage brokerage fee in excess of $800,000.00, etc.) without Tremont having to provide Counterclaimants with the consideration promised under the Agreement.

59.    The actions of Tremont as alleged herein constitute unfair and deceptive acts and practices in violation of M.G.L. c. 93A, §§ 2 & 11.

60.    The unfair and deceptive acts committed by Tremont were knowing and willful.

61.    Tremont's conduct has caused and continues to cause Counterclaimants damage.

62.    According to M.G.L. c. 93A, Counterclaimants are entitled to an award of their reasonable attorney's fees and costs incurred as a result of Tremont's violations of said statute; in addition, Counterclaimants are entitled to an award of two to three times their compensatory and consequential damages as a result of Tremont's knowing and willful violations of M.G.L. c. 93A.

WHEREFORE, Counterclaimants respectfully request that they be awarded a judgment against Tremont as follows:

A.    In favor of Counterclaimants and against Tremont in the full amount of Counterclaimants' actual damages incurred as a result of Tremont's unfair and deceptive acts and practices under M.G.L. c. 93A in an amount to be determined by the trier of fact;

B.    A judgment in Counterclaimants' favor and against Tremont equal to treble damages (*i.e.*, an amount three times Counterclaimants' compensatory and consequential damages) for Tremont's knowing and willful violations of M.G.L. c. 93A;

C.    For an award to Counterclaimants of their reasonable attorney's fees and costs incurred as a result of Tremont's violations of M.G.L. c. 93A; and

D.    All other relief which the Court or other trier of fact deems just and appropriate under the circumstances.

## COUNT III
### (Negligence)

63.    Counterclaimants hereby incorporate by reference all of the allegations set forth in rhetorical paragraphs 1 - 62 of this Counterclaim as if set forth verbatim herein.

64.    The conduct of Tremont in this matter was negligent in several respects, including, but not limited to, the fact that Tremont assembled the financing package which Tremont knew, or a reasonable and prudent mortgage broker in the same circumstance as Tremont should have known, would never get financed.

65.    Tremont's agents and representatives, including, but not limited to, Mee, Gallitto, and Posorske, made statements, representations, and misrepresentations to Counterclaimants which were knowingly false, and/or were made without sufficient knowledge of their truth or falsity of said statements and that conduct, along with

Tremont's other conduct in this matter fell below the standard of care of an ordinary and reasonable and prudent person under the same or similar circumstances.

66.    Tremont's negligent misrepresentations and/or other acts of negligence were the proximate and foreseeable causes of the damages which were consequentially incurred by Counterclaimants as set forth previously.

WHEREFORE, by reason of the foregoing, Counterclaimants pray for a judgment against Tremont as follows:

A.    In an amount sufficient to compensate Counterclaimants for their actual and consequential damages incurred as a result of Tremont's negligence in this matter; and

B.    For all other relief which the Court or other trier of fact deems just and appropriate under the circumstances.

## COUNT IV
### (Breach of Contract)

67.    Counterclaimants hereby incorporate by reference all of the allegations set forth in rhetorical paragraphs 1 - 66 of this Counterclaim as if set forth verbatim herein.

68.    In all contracts entered into in both the State of Arizona as well as the State of Massachusetts there are implied covenants of good faith and fair dealing.

69.    Based upon the matters alleged herein, and otherwise, Tremont breached the implied covenant of good faith and fair dealing, as well as other provisions contained within Agreement existing between the parties.

70.    Tremont never performed its part of the contract and never provided the "subject financing."

71.    Tremont's various breaches of contract have caused, and continue to

cause, damage to Counterclaimants.

WHEREFORE, by reason of the foregoing, Counterclaimants pray for a judgment against Tremont as follows:

A.   In an amount sufficient to compensate Counterclaimants for their actual and consequential damages incurred as a result of Tremont's breach of its Agreement with Counterclaimants;

B.   For all other relief which the Court or other trier of fact deems just and appropriate under the circumstances; and

C.   For an award of Counterclaimants' reasonable attorney's fees and costs incurred in the prosecution of this matter.

## COUNT V
### (Declaratory Judgment)

72.   Counterclaimants hereby incorporate by reference all of the allegations set forth in rhetorical paragraphs 1 - 71 of this Counterclaim as if set forth verbatim herein.

73.   An examination of the Agreement upon which Plaintiff has brought this litigation (Exhibit A to the Complaint) evidences that the alleged Agreement does not contain an expiration date, nor is there otherwise a time parameter set forth in which Tremont is to perform its duties and obligations under said Agreement.

74.   In addition, the Agreement specifically indicates that Tremont is to obtain the "subject financing" for Counterclaimants relative to the Project.  The term "subject financing" is a term that had specifically defined meaning relative to the parties and their Agreement, said defined meaning being previously set forth in paragraph 22 herein above.

75.   According to the parties' alleged Agreement, if said Agreement is

enforceable at all, the obtaining of the "subject financing" for the benefit of the Counterclaimants by Tremont was a condition precedent to Tremont's right to collect its commission as called for under the Agreement. As of this time the "subject financing" has **never** been obtained by Counterclaimants from any lending/funding source supplied by Tremont, or from any other lending/funding source of any kind whatsoever.

76.    Accordingly, an express condition precedent to Tremont's right to receive payment of its commission pursuant to the Agreement has never occurred.

77.    Moreover, a condition subsequent has occurred, specifically the passage of a reasonable period of time in which Tremont was to have performed its obligations under said Agreement.

78.    Given the fact that a commercially reasonable time has expired within which Tremont was to have performed under the Agreement, coupled with the fact that the express condition precedent to the obligation of Counterclaimants to pay any commission to Tremont (*i.e.*, Tremont's arranging for the subject financing for the Project), has not been met, Counterclaimants allege that there is no longer an enforceable agreement existing between the parties and/or that Counterclaimants cannot be deemed to be in breach of an agreement because of the failure of an express condition precedent to Counterclaimants' obligation to perform, namely the failure of Tremont to provide or arrange for the "subject financing."

79.    Accordingly, Counterclaimants seek a declaration of their rights and obligations pursuant to the alleged Agreement.

WHEREFORE, by reason of the foregoing, Counterclaimants pray for a judgment against Tremont as follows:

a.    That no enforceable agreement exists between Counterclaimants and

- 30 -

Tremont;

b.    That even if said agreement is enforceable, the reasonable time for performance by Tremont of its obligations under the Agreement has expired, and Tremont is not entitled to any relief as a result;

c.    Assuming a binding contract was entered into between the parties, and assuming the terms of that Agreement are established, that Tremont has breached said Agreement and is not entitled to any relief as a result;

d.    Counterclaimants also request the Court to declare all of the parties' other rights and obligations pursuant to the alleged Agreement; and

e.    Such other relief as the Court deems just and proper.

## COUNT VI
### (Consumer Fraud)

80.    Counterclaimants hereby incorporate by reference all of the allegations set forth in rhetorical paragraphs 1-79 of this Counterclaim as if set forth verbatim herein.

81.    Arizona Revised Statutes ("A.R.S.") §44-1521, *et seq.* provides that the use by any "person" (defined as being a corporation or individual) of any deception, deceptive act, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact, with intent that the others rely thereon in connection with the sale of any merchandise, whether or not the person, has, in fact, been mislead, deceived, or damaged thereby, is declared to be an unlawful practice.

82.    The providing of personal services has been determined under Arizona law to be encompassed within the definition of "merchandise" within the scope and intent of A.R.S. §44-1521, *et seq.*

- 31 -

83.    A.R.S. §44-1521, *et seq.* inferentially creates a private right of action for deceptive practices in general and, accordingly, Counterclaimants are entitled to bring this cause of action against Tremont.

84.    Counterclaimants have been actually damaged as a result of Tremont's unlawful practices as set forth previously herein.

85.    By reason of the foregoing Tremont is liable to Counterclaimants for violating A.R.S. 1522, *et seq.* and for having perpetrated a consumer fraud upon Counterclaimants.

WHEREFORE, Counterclaimants pray for judgment against Tremont as follows:

A.    In the full amount of Counterclaimants' actual damages incurred in this matter;

B.    For an amount equal to pre-judgment interest on said sums as allowed by law;

C.    For an award of punitive damages in the amount as determined by the court or other trier of fact which is sufficient to punish Tremont for its intentionally tortuous conduct in this matter, as well as in an amount sufficient to operate as a deterrent to others from engaging in such conduct in the future; and

D.    For all other relief which the court or other trier of fact deems just and appropriate under the circumstances.

Respectfully Submitted,

/s/ *William J. Hunt*

William J. Hunt (BBO #244720)
Armando J. Acosta (BBO #648242)
**Clark Hunt & Embry**
55 Cambridge Parkway
Cambridge, MA 02142
(617) 494-1920

Dated:  June 24, 2005

- 32 -

**CERTIFICATE OF SERVICE**

I hereby certify that on the 24th day of June, 2005, a courtesy copy of the above document was served, by first class mail, upon plaintiff's attorneys, James M. Wodarski, Esq., and Michael S. Day, Esq., Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 1 Financial Center, Boston, MA 02111:

/s/ Armando J. Acosta
_____